922 F.2d 1306
 136 L.R.R.M. (BNA) 2153, 59 USLW 2463,
18 Fed.R.Serv.3d 1522,
65 Ed. Law Rep. 81
 Annie Lee HUDSON, K. Celeste Campbell, Estherlene Holme,
Edna Rose McCoy, Debra Ann Petitan, Walter A.
Sherrill and Beverly F. Underwood,
Plaintiffs-Appellants,
v.
CHICAGO TEACHERS UNION, LOCAL NO. 1, Robert M. Healey,
Jacqueline B. Vaughn, Rochelle D. Hart, Thomas H. Reece,
Glendis Hambrick, Individually and as Officers of the
Chicago Teachers Union, Board of Education of the City of
Chicago, Illinois, Raoul Villalobos, Martha Jantho, Thomas
Corcoran, Betty Bonow, Sol Brandzel, Clark Burrus, Leon
Jackson, Rose Mary Janus, Dr. Wilfred Reid, Myrna Salazar,
Dr. Luis Salces and Viola Thomas, Individually and as
Officers and Members of the Board of Education of the City
of Chicago, Illinois, Defendants-Appellees.
 No. 89-2493.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 20, 1990.
Decided Jan. 9, 1991.
 
 Lewis E. Bulkeley, John V. Ryan, III, Rooks, Pitts & Poust, Margaret S. Garvey, Freeborn & Peters, Chicago, Ill., Edwin Vieira, Jr., Manassas, Va., for plaintiffs-appellants.
 Stephen B. Horwitz, S. Leslie Kleiman, Joseph M. Jacobs, Charles Orlove, Jacobs, Burns, Sugarman & Orlove, Wayne B. Giampietro, Lawrence A. Poltrock, Witwer, Burlage, Poltrock & Giampietro, Chicago, Ill., Laurence Gold, David S. Silberman, Washington, D.C., Thomas P. Brown, P. Kevin Connelly, Jody Wilner, Michael J. Sheehan, Connelly, Sheehan & Moran, Robert A. Wolf, John L. Wren, Patricia J. Whitten, Board of Educ. of the City of Chicago, Chicago, Ill., for defendants-appellees.
 Before COFFEY and RIPPLE, Circuit Judges, and REYNOLDS, Senior District Judge.*
 RIPPLE, Circuit Judge.
 
 
 1
 The plaintiffs, nonunion teachers, filed a suit against the Chicago Teachers Union and the Chicago Board of Education that challenged the constitutionality of the procedural scheme employed by the Union to collect "fair share fees"[1] from their nonunion employees. In Chicago Teachers Union v. Hudson, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), the Supreme Court held that the Union's procedural scheme was constitutionally defective. On remand, the district court concluded that the Union's revised procedural scheme was constitutionally adequate under the directives of Hudson and denied the plaintiffs' renewed motion to certify a class. The plaintiffs have appealed both rulings. For the following reasons, we affirm the judgment of the district court.
 
 
 2
 * BACKGROUND
 
 A. Facts
 
 3
 This litigation dates back to 1982. Several nonunion teachers brought suit against the Chicago Board of Education (Board) and the Chicago Teachers Union (CTU). The dispute pertains to an "agency shop agreement" entered into in 1982 between the Board and the CTU. An "agency shop agreement" is one that requires every employee in the collective bargaining unit, whether union or nonunion, to pay a fee to help defray the costs of collective bargaining and contract administration. These agreements originated in response to a perceived "free rider" problem created when nonunion members enjoy the benefits of union representation without contributing to the cost of that representation. The Supreme Court sanctioned the agency shop agreement concept in Abood v. Detroit Board of Education, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977).
 
 
 4
 Until 1982, members of the CTU financed the entire cost of collective bargaining and contract administration, and the nonunion teachers were "free riders." In 1981, however, the Illinois General Assembly amended the School Code to authorize the Board and the CTU to enter into an agency shop agreement. See Chicago Teachers Union v. Hudson, 475 U.S. 292, 294-95, 106 S.Ct. 1066, 1069-70, 89 L.Ed.2d 232 (1986). In 1982, the Board and the CTU entered into such an agreement, which required the Board to deduct fair share fees from nonmembers' paychecks. Id. at 295, 106 S.Ct. at 1070. However, the Illinois statute strictly limited the amount of money deductible from nonmembers' salaries to their proportionate share of the cost of "the collective bargaining process and contract administration." Id. at 295 n. 1, 106 S.Ct. at 1070 n. 1. Such a limitation on the amount of nonmembers' contributions is required by first amendment considerations, which, the Supreme Court has held, forbid a union from collecting "from dissenting employees any sums for the support of ideological causes not germane to its duties as collective-bargaining agent." Ellis v. Railway Clerks, 466 U.S. 435, 447, 104 S.Ct. 1883, 1891, 80 L.Ed.2d 428 (1984). The Supreme Court has also ruled that a union must supply nonmembers an adequate notice or explanation of the basis for the fair share fee so that the nonmembers may challenge the fee amount if they believe their first amendment rights were infringed as proscribed by Ellis. See Hudson, 475 U.S. at 306, 106 S.Ct. at 1075. At the heart of this dispute is the adequacy of the notice procedure employed by the CTU to explain the basis for the fair share fee amount collected from the plaintiffs. For advance clarification, this appeal involves three separate fair share notice procedures. The first (FSN-1) was in place for the 1982-83 school year; the second (FSN-2), for the 1986-87 school year; and the third (FSN-3), for the 1987-88 school year.
 
 B. Procedural History
 
 5
 1. FSN-1 and the Supreme Court's Hudson decision
 
 
 6
 In 1983, the plaintiffs challenged the constitutionality of the CTU's fair share fee amount for the 1982-83 school year. See Hudson v. Chicago Teachers Union, 573 F.Supp. 1505 (N.D.Ill.1983). The CTU had computed the nonmembers' fair share fee of the relevant representational costs at ninety-five percent of union members' dues. Id. at 1509. The CTU also established a procedure for considering nonmembers' objections to the deduction (FSN-1). Id. at 1508. After receiving a minimal response from the CTU, the plaintiffs challenged FSN-1 in district court as violative of their first and fourteenth amendment rights. Id. at 1515.
 
 
 7
 The district court rejected these constitutional challenges. Id. On appeal, however, this court reversed. See Hudson v. Chicago Teachers Union, 743 F.2d 1187 (7th Cir.1984). We concluded that the constitution requires the CTU to implement a procedure that protects nonmembers from being compelled to subsidize ideological activities that are not germane to the collective bargaining process and that the CTU's FSN-1 was inadequate to meet this requirement. Id. at 1190, 1192. The Supreme Court granted certiorari and affirmed our judgment. See Chicago Teachers Union v. Hudson, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). The Supreme Court concluded that FSN-1, as initially adopted by the CTU, contained three fundamental flaws: (1) its choice of a simple rebate remedy created an impermissible risk that nonmembers funds would be used (albeit temporarily) for an impermissible purpose; (2) the procedure failed to provide an adequate justification for the advance deduction of the fees; and (3) the procedure failed to provide a reasonably prompt resolution of disputes by an impartial decisionmaker. Id. at 304-09, 106 S.Ct. at 1074-77. The Court also concluded that the CTU's attempt to remedy these flaws by placing all nonmember funds in escrow did not cure problems (2) and (3) above. Id. at 309-10, 106 S.Ct. at 1077-78. The Court remanded the case to the district court to determine an appropriate remedy. Id. at 310, 106 S.Ct. at 1077.
 
 
 8
 2. District court's decision on class certification
 
 
 9
 In their initial action, the plaintiffs sought to maintain a class action on behalf of all similarly situated nonunion employees. See 573 F.Supp. at 1507. They had moved for certification of the class. However, because the district court upheld the constitutionality of FSN-1, the court dismissed the motion to certify as moot. Id. at 1522. On remand, the plaintiffs again moved for class certification. See Hudson v. Chicago Teachers Union, 117 F.R.D. 413, 414 (N.D.Ill.1987). The district court denied the motion. Id. at 415. It concluded that the decision to certify the class hinged on the single issue of the type of relief sought by the plaintiffs. The court reasoned that, while the plaintiffs' initial goal in the lawsuit appeared to be injunctive relief (a Rule 23(b)(2) class action),[2] the Supreme Court's adjudication of their case granted the relief the plaintiffs initially sought. Id. Moreover, under the Supreme Court's decision, the court noted, all prospective class members already were guaranteed a procedure that protected their first amendment rights. Thus, the court concluded, the only remaining rationale for certifying a class would be to allow the plaintiffs to seek damages from the CTU (a Rule 23(b)(3) class action).[3] Certification of a (b)(3) class, however, was precluded by the Seventh Circuit's and Supreme Court's prior adjudication of the merits of the plaintiffs' claims. Id. The court explained that Rule 23 requires certification of a (b)(3) class prior to a determination on the merits in order to prevent the inequitable practice of "one-way intervention"--in which a prospective plaintiff could avoid the binding effect of a potential adverse judgment by waiting to see if the litigation was successful on the merits before joining the class. Id. Thus, the court believed it had no choice but to deny the plaintiffs' motion for certification. Id.
 
 3. District court's decision on FSN-3
 
 10
 Meanwhile, the CTU attempted to revise its fair share notice procedure to comply with Hudson 's mandate. A revised procedure was implemented for the 1986-87 school year (FSN-2), but the plaintiffs challenged it as constitutionally inadequate under Hudson. While the adequacy of FSN-2 was before the district court, the parties agreed that all fair share fees collected by the CTU would be deposited with the clerk of the court pursuant to Rule 67 (Rule 67 funds).[4] See Hudson v. Chicago Teachers Union, 699 F.Supp. 1334 (N.D.Ill.1988). In June of 1987, the CTU moved for release of the Rule 67 funds on the ground that FSN-2 complied with the constitutional requirements set forth in Hudson. However, before the district court ruled on this motion, the 1987-88 school year began, and the CTU had further refined its fair share notice procedure (FSN-3). By agreement of the parties, the lawsuit focused on the adequacy of FSN-3 rather than FSN-2. The plaintiffs maintained their contention that FSN-3 did not comply with the Supreme Court's mandate.
 
 
 11
 The district court then considered another CTU motion to release the Rule 67 funds on the ground that FSN-3 complied with Hudson 's mandate. The court rejected the plaintiffs' claim that FSN-3 failed to comply with Hudson. To the contrary, the court concluded that the ability of the plaintiffs to criticize the CTU's calculation of the fair share fee based on its employment of allegedly inappropriate cost allocation methods and an improper definition of collective bargaining actually demonstrated that the CTU was complying with the primary mandate of Hudson: providing sufficient information to potential objectors to enable them to gauge the propriety of the fee. Id. at 1340, 1343. The district court concluded that the plaintiffs' challenge to the CTU's methods for determining the fee mistakenly confused the separate issue of adequacy of notice with the issue of the accuracy of the fee itself. Id. at 1340. The court explained that, under Hudson, the notice procedure could pass constitutional muster without necessarily guaranteeing the accuracy of the fee. To address nonmembers' challenges to the accuracy of the fee, Hudson mandated that the CTU provide a reasonably prompt opportunity for the resolution of disputes by an impartial decisionmaker. Id. The purpose of the notice procedure was limited; it only had to give the plaintiffs enough information to evaluate the accuracy of the fee so that they could determine whether they wanted to challenge the fee. Moreover, the court noted that, if Hudson had intended the federal courts to scrutinize meticulously the accuracy of the fee, it would not have required the CTU to establish its own internal procedure for resolving fee disputes. Id. at 1340.
 
 
 12
 The court next addressed the plaintiffs' specific challenges to the fee calculation and the notice procedure. First, it concluded that the CTU's own arrangement for holding disputed funds in escrow would provide the plaintiffs protection until an impartial decisionmaker resolved their challenges to the fee. Id. at 1341. Thus, the court concluded that its holding these funds in escrow was duplicative and unnecessary. Id. The court rejected the plaintiffs' argument that FSN-3 had to explain the rationale for the underlying assumptions employed in calculating the fee. The court concluded that the mere disclosure of these underlying assumptions performed the constitutional function of enabling the plaintiffs to assess the propriety of the fee. Id. at 1341. It also rejected the plaintiffs' complaint that the notice lacked detailed breakdowns of activities and costs. The court noted the Supreme Court's statement in Hudson that the CTU " 'need not provide nonmembers with an exhaustive and detailed list of all its expenditures.' Instead of mandating a notice filled with painstaking detail, the Constitution merely requires that a fair share notice 'include the major categories of expenses.' " Id. (quoting Hudson, 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18).
 
 
 13
 The court then turned to the plaintiffs' objection that an independent auditor had not verified the CTU's underlying definition of "collective bargaining." The court agreed with the Second Circuit's reading of Hudson, which limited the auditor's role to the "usual function": ensuring the expenditures that the CTU claimed to make for certain expenses actually were made for those expenses. Id. at 1342 (citing Andrews v. Education Ass'n of Cheshire, 829 F.2d 335, 340 (2d Cir.1987)).[5] The court noted that plaintiffs' proposed interpretation of the auditor's duties would usurp the function of the independent decisionmaker: "determining whether union expenses are properly chargeable to nonunion employees." Id. at 1341.
 
 
 14
 The court also determined that the CTU's method of verifying the distribution of its salary expenses between collective bargaining and non-collective bargaining activities passed muster. Id. at 1342. The court believed that the independent auditor had dug far enough beneath the surface to verify the conclusions reflected in the activity reports of salaried CTU personnel. Id. It further believed that the auditor's verification of salary expenses without resort to time reports was within the reasonable range of discretion accorded to the auditor. Id. at 1342-43.[6] Finally, the court rejected plaintiffs' argument that FSN-3 would mislead or confuse a literate person (i.e., a teacher) concerning the extent to which the auditor endorsed the underlying definition of collective bargaining in FSN-3. Id. at 1343.
 
 
 15
 In sum, the court concluded that the CTU's FSN-3 fulfilled the constitutional mandate of Hudson by providing the plaintiffs with adequate information to evaluate the propriety of the fee calculation. The court reiterated that the detail of plaintiffs' objections to the fee calculation and the notice itself demonstrated that FSN-3 was serving its purpose. Discerning no further reason to hold the disputed fees in escrow, the court granted the CTU's motion to release the Rule 67 funds, ordered the CTU to hold any disputed fees in its own escrow pending resolution of these disputes, and ordered the CTU to exempt the plaintiffs from the deadline (which already had passed during the course of the litigation) for filing fee objections under the CTU's internal dispute resolution procedure. Id. at 1344.
 
 4. Plaintiffs' motion for final judgment
 
 16
 After the district court issued its order and opinion on November 16, 1988, the plaintiffs moved, inter alia, for entry of a final judgment based on the order. The court denied the motion because the November 16 order did not resolve all of the issues raised by the plaintiffs' amended complaint. The court noted that the Supreme Court's ruling in Hudson clearly entitled the plaintiffs to an award of damages arising from the constitutional deficiencies in FSN-1, but that the district court had yet to address the issue of damages. The court indicated that, under the Federal Rules of Civil Procedure, a judgment does not become final until the court awards damages or other relief.
 
 
 17
 The plaintiffs also moved for a stay of the November 16 order pending appeal of that order. The court determined that the plaintiffs actually sought a reinstatement of the Rule 67 escrow arrangement. In response to this motion, the CTU offered to return these funds to escrow with the court and to deposit all of the plaintiffs' future fair share fees with the court pending resolution of the appeal. The district court concluded that this procedure would protect adequately the plaintiffs' interest during the pendency of the appeal and ordered the CTU to follow its proposed procedure. The court then denied the plaintiffs' motion for a stay because the CTU agreement to deposit the funds with the court rendered the issue moot.
 
 5. Stipulation for entry of judgment
 
 18
 The district court set April 19, 1989, for a status hearing to address the remaining issues in the litigation. When plaintiffs' counsel failed to appear at the status hearing, the court dismissed the plaintiffs' case with prejudice. On April 28, 1989, the plaintiffs moved to vacate the order of dismissal. The court responded by setting another status conference for June 7, 1989. Following this conference, the parties entered into a Stipulation for Entry of Judgment, which was filed on June 21, 1989. This document stated that the parties "stipulate to the entry of a final judgment on the following terms":
 
 
 19
 (1) the court's order dismissing the plaintiffs' case for failure to appear be reversed;
 
 
 20
 (2) the plaintiffs, "without waiving any right of appeal," accept Judge Bua's decisions of October 14, 1987 (117 F.R.D. 413) (denying class certification) and November 16, 1988 (699 F.Supp. 1334) (holding FSN-3 constitutionally adequate) as "terminating the substantive issues in this action"; the plaintiffs also agree to "withdraw any claim not resolved by those decisions except": (A) an award to all plaintiffs of $1.00 in nominal damages (which the parties agreed to in the Stipulation); (B) reasonable attorney's fees and costs from the initiation of the suit through the date of the Supreme Court's 1986 decision in the case; and (C) any claims the plaintiffs might raise by invoking the FSN-3 procedure within 45 days of judgment;
 
 
 21
 (3) each plaintiff receives $1.00 in nominal damages;
 
 
 22
 (4) plaintiffs are allowed 120 days, pursuant to Local Rules 45 and 46, to file a petition for attorney's fees and costs if the parties cannot resolve that issue beforehand by stipulation;
 
 
 23
 (5) the individual defendants in the case are dismissed with prejudice;
 
 
 24
 (6) plaintiffs have 45 days from the date of judgment to file appeals under FSN-3 with respect to the 1987-88 school year;
 
 
 25
 (7) all money now being escrowed pursuant to Rule 67 will be turned over to the CTU within 45 days of the date of this judgment. However, if plaintiffs file internal appeals under FSN-3, these disputed funds will be escrowed pursuant to Rule 67 until an arbitrator's determination (and possible subsequent judicial review) of the fee for 1987-88.
 
 
 26
 See Stipulation for Entry of Judgment at 1-3 (Appellant's App. A-15). On June 22, 1989, the district court vacated its earlier dismissal of the plaintiffs' case and entered judgment in accordance with the terms of the parties' Stipulation for Entry of Judgment.
 
 6. This appeal
 
 27
 Following the entry of judgment, the plaintiffs filed a notice of appeal on July 18, 1989. The plaintiffs raise two issues on appeal: (1) whether the district court erred in denying its motion for class certification in its October 14, 1987 order (117 F.R.D. 413); and (2) whether the district court's order of November 16, 1988 (699 F.Supp. 1334) "erroneously granted an effective summary judgment to [the CTU] on the constitutionality of FSN-3 under Hudson, without addressing most of the underlying legal issues, and in the teeth of manifest dispute as to many material facts." Appellant's Br. at 16.
 
 II
 ANALYSIS
 A. Propriety of Our Review
 
 28
 Before we address these issues, we must put to rest the Board's[7] arguments that certain impediments foreclose our review of this case. This task need not detain us long.
 
 1.
 
 29
 The Board first contends that we lack appellate jurisdiction. This argument focuses on the Stipulation for Entry of Judgement described in the preceding section. The thrust of the argument is that, even though the Stipulation expressly stated that the teachers accept the district court's two decisions as terminating the substantive issues in the litigation, "without waiving any right of appeal," the Stipulation constituted a settlement rather than "an involuntary and adverse judgment." A settlement is not appealable.[8]
 
 
 30
 There appears to be a split among the circuits with respect to whether a stipulated judgment may be appealed. The Eleventh Circuit allowed an appeal when the parties' stipulation expressly stated an intent to appeal. See Dorse v. Armstrong World Indus., 798 F.2d 1372, 1376 (11th Cir.1986). By contrast, the Fifth Circuit did not allow an appeal from a consent judgment even though "it contained a recognition that the plaintiff wished to appeal" the issues contained within the judgment. Amstar Corp. v. Southern Pac. Transp. Co. of Texas & Louisiana, 607 F.2d 1100, 1100 (5th Cir.1979) (per curiam), cert. denied, 449 U.S. 924, 101 S.Ct. 327, 66 L.Ed.2d 153 (1980). But see Greenhouse v. Greco, 544 F.2d 1302, 1305 (5th Cir.1977) (party who consented to dismissing case as moot so as to appeal district court's order was not barred from appealing the case because the party did not consent to a judgment that would preclude appellate review).
 
 
 31
 This circuit has not encountered the precise issue presented in Dorse and Amstar. However, we approvingly cited the Dorse decision in Bash v. Firstmark Standard Life Insurance Co., 861 F.2d 159 (7th Cir.1988).[9] There we stated that one way a party could have sought an appeal of a partial summary judgment was by "negotiat[ing] a settlement agreement that was expressly conditional on the order of partial summary judgment being upheld on appeal. Then it would have been clear that he was not waiving his right to appeal by consenting to the entry of a final judgment." Id. at 162-63 (emphasis supplied) (citations omitted). Bash evidences regard for the Supreme Court's admonition that jurisdictional issues ought to be analyzed pragmatically. See Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 109 S.Ct. 2218, 2225, 104 L.Ed.2d 893 (1989). We follow the same course here. Before the district court was the plaintiffs' motion to vacate the default judgment. While granting the motion to vacate, the district court accepted the parties' stipulation that resolved one unresolved issue between them--the amount of damages due because of FSN-1. The stipulation further memorialized their continued disagreement with respect to the other issues already decided by the district court. Under these circumstances, "the practicalities" certainly require that we treat the judgment entered by the district court as an appealable one.[10]
 
 2.
 
 32
 The Board also maintains that this appeal presents no justiciable controversy. The Board points out that, while the district court's order of November 16, 1988 determined the constitutionality of FSN-3, it did so in the context of adjudicating CTU's motion for a release of the Rule 67 funds being held in escrow with the court. The stipulated judgment now requires that those funds remain in escrow. Therefore, argues the Board, the underlying issue is moot and the district court's opinion is purely advisory. In the Board's view, the district court's opinion and reasoning cannot be viewed independently from the relief granted.
 
 
 33
 We recognize that this court " 'reviews judgments, not statements in opinions.' " California v. Rooney, 483 U.S. 307, 311, 107 S.Ct. 2852, 2854, 97 L.Ed.2d 258 (1987) (per curiam) (quoting Black v. Cutter Laboratories, 351 U.S. 292, 297, 76 S.Ct. 824, 827, 100 L.Ed. 1188 (1956)). However, we must assess--pragmatically--the litigation in its totality. We think it clear that the district court's entry of a final judgment pursuant to the stipulation and judgment amounted to its denial of any relief to the plaintiffs with respect to their contention that FSN-3 is constitutionally infirm. That determination, in the context of this lawsuit, is hardly advisory. See United States v. Procter & Gamble, 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958).
 
 
 34
 B. The Constitutionality of FSN-3 Under Hudson
 
 
 35
 The plaintiffs challenge the district court's conclusion that the CTU's FSN-3 was constitutionally sufficient under the Supreme Court's directives in Hudson. The Supreme Court listed three procedural prerequisites to the receipt of fair share fees:
 
 
 36
 We hold today that the constitutional requirements for the [CTU's] collection of agency fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending.
 
 
 37
 475 U.S. at 310, 106 S.Ct. at 1078. The plaintiffs' attack focuses on the first requirement: an adequate explanation of the basis for the fee.
 
 
 38
 We believe the plaintiff's position suffers from a fundamental misapprehension as to what Hudson requires. Plaintiffs' complaints have little to do with the constitutional adequacy of FSN-3. Instead, the plaintiffs attack how the CTU calculated the fair share fee. They claim that the CTU has based its fee calculation on an incorrect definition of collective bargaining services, identified categorical expenses too broadly, relied on an economically "invalid" method for allocating costs between chargeable and non-chargeable categories, allocated as chargeable costs activities which do not benefit teachers, employed "incomplete, insufficient, and misleading" accounting verifications, and used incorrect formulas in calculating allocable costs for collective bargaining. Taken in its entirety, plaintiffs' challenge asserts that a prior hearing and prior judicial determination of the correctness of a fair share fee is a precondition to the collection of the fee. Requiring the federal courts to micro-manage the fee calculation in every case challenging a union's fair share fee would place an overwhelming and unrealistic burden on the courts. More fundamentally, we agree with the district court's assessment that the plaintiffs' challenge "mistakenly equates the adequacy of the notice with the accuracy of the fee assessment," Hudson, 699 F.Supp. at 1340, and thus squarely contradicts Hudson 's holding and rationale. Contrary to the plaintiffs' position, Hudson did not contemplate that federal courts would be required, on the basis of the notice, to pass on the legality and accuracy of every element of the fee calculation before any fees could be collected. Were we to accept plaintiffs' invitation and provide a hearing and judicial determination of the correctness of the fee, we would in effect render redundant and irrelevant the requirements that an impartial decisionmaker hear the dispute and that an escrow account be provided for the amounts reasonably in dispute while the challenge is pending. The proper procedure employs each of the three prerequisites identified by the Supreme Court: the fair share notice provides the basis for a challenge to the fair share fee assessment; the impartial decisionmaker determines the correctness of the fee amount; and the escrow protects the challenger's funds pending such a decision. The Supreme Court's prerequisites presuppose that a fee has already been collected and that the challenge will be decided after the fee has been collected. The federal court does not, at this stage, review the fee calculation. Indeed, the Supreme Court noted, "[i]n other First Amendment contexts, of course, we have required swift judicial review of the challenged government action. In this context, we do not believe that such special judicial procedures are necessary." 475 U.S. at 307 n. 20, 106 S.Ct. at 1076 n. 20. Of course, the impartial decisionmaker's determination is not the final word on the challenge. If the decision is adverse to the plaintiffs, they may subsequently seek review by a federal court. See id. at 308 n. 21, 106 S.Ct. at 1077 n. 21.
 
 
 39
 The singular role of the federal courts in reviewing the adequacy of a fair share notice is to determine whether the notice gives the nonunion members enough information to challenge the basis for the fee. See id. at 306, 106 S.Ct. at 1075 (holding that the notice procedure must provide potential objectors "sufficient information to gauge the propriety of the union's fee"); Gilpin v. American Fed'n of State, County, & Mun. Employees, 875 F.2d 1310, 1316 (7th Cir.) (court noting the notice procedure contained enough information "to allow the employees to decide whether there is any reason to mount a challenge"), cert. denied, --- U.S. ----, 110 S.Ct. 278, 107 L.Ed.2d 258 (1989); Gwirtz v. Ohio Educ. Ass'n, 887 F.2d 678, 682 (6th Cir.1989) (holding that Hudson only requires union's procedure to provide adequate disclosure so that nonmember employees could "gauge the propriety of the union's fees"), cert. denied, --- U.S. ----, 110 S.Ct. 1810, 108 L.Ed.2d 941 (1990); Andrews v. Education Ass'n of Cheshire, 829 F.2d 335, 340 (2d Cir.1987) (holding that once the union's procedure satisfies Hudson standard, it should be upheld even if nonmembers can provide better procedure).
 
 
 40
 In determining the adequacy of FSN-3's notice, our course has been chartered by Ping v. National Educ. Ass'n, 870 F.2d 1369 (7th Cir.1989) and Gilpin. In interpreting the fair share notice prerequisite articulated in Hudson, the Ping court concluded that "the union must disclose sufficient information to permit non-members to make an informed decision about whether to object to the amount of the fair share fee." 870 F.2d at 1372 (citing Hudson, 475 U.S. at 306-07, 106 S.Ct. at 1075-76). One month following the Ping decision, the Gilpin court decided a challenge to the adequacy of a union's fair share notice. A comparison between the fair share notice upheld in Gilpin, and the CTU's FSN-3, leads us to conclude that FSN-3 likewise is adequate under Hudson.
 
 
 41
 The Gilpin plaintiffs complained that the union's notice lacked sufficient detail to enable them to determine the probable success of a challenge to the fair share fee. Yet the court noted:
 
 
 42
 [T]he notice breaks down the union's activities into 35 categories and indicates which ones the union considers activities wholly in support of its agency mission (e.g., adjusting grievances under the collective bargaining agreement), which it considers wholly unrelated to that mission (e.g., contributing to political campaigns), and which it considers a mixture of agency and other functions (e.g., publishing a union newsletter). The notice recites that the arbitrator has found that the union's allocation of expenses in accordance with this breakdown is proper, and offers a copy of his detailed ruling for $1.50. The notice contains another list of 35 items--not the 35 separate activities that the union engages in but the 35 different types of expenditures listed in its audited financial statement (salaries and benefits, depreciation, telephone, etc.)--and indicates what percentage of each is chargeable to union nonmembers as part of the agency fee.
 
 
 43
 875 F.2d at 1316. The court rejected the plaintiffs' complaint that the notice did not explain the principles under which chargeable expenses were allocated to the fee because "if it did, the notice would be as long and complicated as an SEC prospectus." Id. The court observed that the notice did indicate which activities were wholly or partly pursuant to collective bargaining activities and what percentage of each expenditure item is allocated for such. Id. Thus, the court concluded, "[t]his should be enough information ... to allow the employee to decide whether there is any reason to mount a challenge." Id.
 
 
 44
 In the present case, the CTU's thirty-nine page FSN-3 is more complete and more informative than the three page notice approved in Gilpin. It informs nonmember employees that their fair share fee reflects the nonmembers proportionate share of the costs of services rendered by the CTU, necessarily and reasonably incurred for the purpose of performing collective bargaining activities. The FSN-3 identifies and defines two categories: chargeable expenses and non-chargeable expenses. Each category is defined and further broken down to specific items of expenditures.[11] The non-chargeable expenses category follows a similar detailed breakdown. The FSN-3 contains the CTU's audit report prepared by its independent certified public accountant. The CTU's accountant issued a "special report," which, the CTU informs us and plaintiffs do not contest, is the highest level of review and the best format for presenting the results of such a review. The report allocates expenses in twenty-two line items between those that are chargeable and those that are nonchargeable and provides a dollar amount for each category.[12] The report further provides a detailed explanation of the techniques employed in producing the report.[13] The FSN-3 also provides similar audit reports for the state and national unions affiliated with the CTU.
 
 
 45
 The FSN-3 provides a two page summary sheet that gives an overview of how the accounting reports were translated into calculation of the fair share fee. The summary breaks down the CTU's expenditures into thirteen functional categories, providing the percentage of total expenditures within each category. Twelve of the categories are treated as chargeable in calculating the fair share fee, and the thirteenth category groups all non-chargeable expenditures.[14] Moreover, the FSN-3 details the arbitration procedure available to employees who wish to challenge the fee, and the rights of employees in that procedure.[15] It explains that an employee may initiate a challenge by stating an objection in a letter to the CTU and that the CTU will have the burden of proving that the fee amount is pursuant to applicable federal and state law in any arbitration proceeding. Finally, the CTU offers to make available to a challenger any relevant books and records prior to and in preparation for the arbitration proceeding.
 
 
 46
 After reviewing the FSN-3, we conclude that the district court properly found that it was constitutionally adequate under Hudson and in accordance with our prior precedents because it provides sufficient information to enable the plaintiffs "to decide whether there is any reason to mount a challenge." Gilpin, 875 F.2d at 1316. We have reviewed other cases in which courts have found the notice provisions inadequate under Hudson. The CTU's FSN-3 suffers from none of the deficiencies identified in those cases.[16] As we noted above, the plaintiffs have advanced a plethora of objections to the CTU's methods for calculating the fair share fee amount. We need not pass on their merits because the proper forum for these objections is before the independent arbitrator, not before this court.
 
 C. Class Certification
 
 47
 Although we have ruled adversely to the plaintiffs' FSN-3 challenge, we still must address their class certification contention. On remand from the Supreme Court, the district court denied the plaintiffs' renewed motion to certify a class. It reasoned that the Supreme Court's adjudication of FSN-1 provided the injunctive relief initially sought by the plaintiffs and also protected all prospective class members. See Hudson, 117 F.R.D. at 415. Therefore, the court observed that the only remaining reason to certify a class would be to recover damages because of the deficiencies found in FSN-1. The court noted that the Federal Rules of Civil Procedure require that a class action seeking damages must be certified before a determination on the merits in order to prevent the inequitable practice of "one-way intervention." See id. The plaintiffs contend that the court mischaracterized their motion. The plaintiffs take issue with the district court's conclusion that they sought class certification only for the purpose of obtaining money damages for the violation of constitutional rights under FSN-1. Instead, the plaintiffs contend that, pursuant to their amended complaint, they sought both injunctive relief and monetary damages for constitutional violations arising from FSN-1 and any other fair share notice presented by the CTU after FSN-1 that failed to meet Hudson 's mandates. Thus, the plaintiffs argue, because no court had ruled on the constitutionality of FSN-3 at the time of the motion, the district court incorrectly applied the "one-way intervention" rationale to bar certification.
 
 
 48
 To the extent that the plaintiffs' motion for certification sought monetary damages for constitutional violations under FSN-1, the district court correctly articulated the Supreme Court's and this circuit's rationale for denying certification on the "one-way intervention" rationale. See American Pipe & Constr. Co. v. Utah, 414 U.S. 538, 547, 94 S.Ct. 756, 763, 38 L.Ed.2d 713 (1974); Roberts v. American Airlines, Inc., 526 F.2d 757, 763 (7th Cir.1975), cert. denied, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976); Jimenez v. Weinberger, 523 F.2d 689, 697-98 (7th Cir.1975), cert. denied, 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1204 (1976); Peritz v. Liberty Loan Corp., 523 F.2d 349, 353-54 (7th Cir.1975). Moreover, to the extent that the plaintiffs' motion sought certification for purposes of obtaining injunctive relief or monetary damages based on FSN-3 or any future version of the notice procedure, we uphold the district court's decision to deny the class certification on the independent ground that, in light of our decision today, the matter is moot.
 
 Conclusion
 
 49
 For the foregoing reasons, we affirm the judgment of the district court.
 
 
 50
 AFFIRMED.
 
 
 
 *
 Hon. John W. Reynolds, of the Eastern District of Wisconsin, sitting by designation
 
 
 [1]
 The term "fair share fee" is synonymous with the term "agency fee" and is a fee "paid by non-union employees to a union to cover the employees' pro rata share of the costs of the union's pativities as the exclusive representative of the employees in dealing with management." Ping v. National Educ. Ass'n, 870 F.2d 1369, 1370 (7th Cir.1989)
 
 
 [2]
 See Fed.R.Civ.P. 23(b)(2) (class action for injunctive or declaratory relief)
 
 
 [3]
 See Fed.R.Civ.P. 23(b)(3) (questions of law or fact common and predominative to the class)
 
 
 [4]
 See Fed.R.Civ.P. 67 (sum of money may be deposited with district court when it is the subject of requested judgment)
 
 
 [5]
 The Andrews court's view of the auditor's role was adopted by this court in Ping v. National Educ. Ass'n, 870 F.2d 1369, 1374 (7th Cir.1989) (finding Andrews explicitly repudiated the argument that an independent auditor must make legal determinations on whether an expense is chargeable, nonchargeable, or questionable)
 
 
 [6]
 The court did, however, suggest that the CTU institute a procedure that would require its employees to fill out time reports in case a future auditor considered it necessary to examine such reports. 699 F.Supp. at 1343 n. 6
 
 
 [7]
 Pursuant to their motion to extend the time for filing their briefs, the Board and CTU divided the briefing task. The Board addressed the jurisdictional issues presented below, but for all practical purposes they represent the views of CTU as well
 
 
 [8]
 See generally Geaney v. Carlson, 776 F.2d 140, 142 (7th Cir.1985) (voluntary dismissal not appealable because it is not an involuntary adverse judgment); Stewart v. Lincoln-Douglas Hotel Corp., 208 F.2d 379, 381 (7th Cir.1953) (party who consents to entry of order of judgment waives right to claim court committed error in entering the order)
 
 
 [9]
 Like the panel in Bash, we see much merit in the Eleventh Circuit's approach in Dorse. We note, as did the Dorse court, Justice Blackmun's dissent from denial of certiorari in Amstar. He suggested that Amstar was wrongly decided because it "ignores the parties' intent in executing a consent to a judgment and in their subsequent actions thereto." Amstar Corp. v. Southern Pac. Tansp. Co. of Texas & Louisiana, 449 U.S. 924, 924, 101 S.Ct. 327, 327, 66 L.Ed.2d 153 (1980) (Blackmun, J., dissenting from denial of certiorari). Justice Blackmun believed "petitioner [was] entitled to a ruling on the merits of its appeal to the Court of Appeals, and [was] not to be foreclosed by a strict concept of consent and acceptance in the face of facts that asserted consent was specifically limited and that petitioner consistently and persistently disclaimed full settlement of the lawsuit." Id. at 927, 101 S.Ct. at 329. Justice Blackmun apparently believed those facts sufficient to raise "a claim of lack of actual consent." Id. at 926, 101 S.Ct. at 328 (quoting Swift & Co. v. United States, 276 U.S. 311, 314, 48 S.Ct. 311, 72 L.Ed. 587 (1928) (holding that a party could seek appellate review of a consent judgment containing no reservations relevant to the issue sought to be appealed if that party lacked "actual consent")). The plaintiffs' reliance on Donovan v. Penn Shipping Co., 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977) (per curiam), is misplaced. That case dealt exclusively with the "settled proposition" that one who accepts a remittitur, even "under protest," may not appeal to seek reinstatement of the original verdict. Id. at 649, 97 S.Ct. at 836
 
 
 [10]
 While we continue to see much merit in the Eleventh Circuit's approach in Dorse, we note that the unique procedural posture of this case does not require that we face squarely the apparent conflict between the Fifth and Eleventh Circuits. Once the district court vacated its default judgment, it entered a judgment that encompassed earlier rulings upon which there was clear disagreement among the parties. See United States v. Procter & Gamble, 356 U.S. 677, 680, 78 S.Ct. 983, 985, 2 L.Ed.2d 1077 (1958). Only the matter of damages was the subject of a true "stipulation."
 
 
 [11]
 The notice provides a listing of chargeable expenses: "negotiating and administering the collective bargaining contract; settling grievances and disputes by mutual agreement, or in arbitration, court or otherwise; activities and undertakings normally and reasonably employed to implement the duties of the Union as exclusive representative of the employees in the bargaining unit; and the maintenance of the Union's associational existence."
 The notice then provides examples of chargeable expenses: "preparation for and negotiations of collective bargaining agreements with the Chicago Board of Education; contract administration including investigation and processing grievances; meetings, conferences, administrative, arbitral and court proceedings and pertinent investigation and research in connection with work related subjects and issues; handling work related problems of employees; communications with community organizations, civic groups, government agencies and the media respecting the Union's position on work related matters; lobbying and legislative activities with respect to matters concerning employees' work related issues; maintaining membership and recruitment of Board employees; employees group programs; and providing legal, economic and technical expertise in behalf of employees in all matters relating to work related matters."
 
 
 [12]
 For example, the report classifies expenditures in general categories such as affiliation fees, salaries, employee benefits, travel and other employee expenses, legislative, and rent and utilities, and then allocates the expenditures into those that are chargeable and those that are nonchargeable, accompanied by a dollar amount allocated to each category
 
 
 [13]
 The report explains the method of accounting used in producing the report, the definitions of chargeable and nonchargeable expenses, and material factors and assumptions used to allocate expenditures within each of the 22 general expense classifications. For example, the report explains that salaries of officers and field staff were allocated between chargeable and nonchargeable categories based on review of the CTU's records for these employees, interviews with the employees, and a review of the employees' own records
 
 
 [14]
 Thus, the reader can quickly determine that the non-chargeable expenses (political and ideological expenses) amounted to 14.16% of the total amount of dues charged to members of the CTU
 
 
 [15]
 We note the extensive detail of FSN-3: the Gilpin notice described the procedure in half a page; the FSN-3 spends seven pages explaining the CTU's internal appeal procedure (including how to file an objection) and the rules developed by the American Arbitration Association, the organization which arbitrates any challenges to the fair share fee assessment
 
 
 [16]
 For example, in Grunwald v. San Bernardino Unified School District, 917 F.2d 1223 (9th Cir.1990), the notice provision was defective because it (1) failed to provide for advance fee reductions, and (2) failed to furnish nonmembers with advance notice prior to collecting the fee. Id. at 1227-29. In Damiano v. Matish, 830 F.2d 1363 (6th Cir.1987), the notice provision faltered because it (1) failed to inform the nonmembers of the actual amount of the fee or how it had been calculated, (2) forced the nonmembers to specifically request information about the basis for the fee, and (3) required the nonmembers to object to the fee amount without having information about the amount of the fee, the method used to calculate the fee, or the major activities for which the fee would be used. Id. at 1370-71. Likewise, the notice provision failed in Tierney v. City of Toledo, 824 F.2d 1497 (6th Cir.1987), because it (1) required a forced extraction of the full union due amount followed by a rebate to nonmembers, (2) provided no instruction to nonmembers regarding the making of an effective objection, and (3) failed to provide for an impartial decisionmaker. Id. at 1505-06