PRODUCTION WORKERS UNION OF
CHICAGO AND VICINITY, LOCAL
707, Petitioner, Cross–Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent, Cross–
Petitioner,

and

Faustino Ramos, Intervening Respondent,
Cross–Intervening Petitioner.

Nos. 96–3400, 96–3833.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 20, 1998.

Decided Nov. 20, 1998.

Patrick J. Calihan (argued), Chicago, IL, for Production Workers Union of Chicago and Vicinity in No. 96–3400.

Patrick J. Calihan (argued), Chicago, IL, Cora Vaughin, Gary, IN, for Production Workers Union of Chicago and Vicinity in No. 96–3833.

Elizabeth Kinney, National Labor Relations Board, Region 13, Chicago, IL, John D. Burgoyne, National Labor Relations Board, Appellete Court, Enforcement Litigation, Washington, DC, for National Labor Relation Board in No. 96–3400.

Steven B. Goldstein (argued), National Labor Relations Board, Contempt Litigation Branch, Washington, DC, Elizabeth Kinney, National Labor Relations Board, Region 13, Chicago, IL, John D. Burgoyne, National Labor Relations Board, Appellete Court, Enforcement Litigation, Washington, DC, for National Labor Relation Board in No. 96–3833.

Glenn M. Taubman (argued), National Right To Work Legal Defense Foundation, Springfield, VA, for Faustino Ramos.

Before BAUER, COFFEY and ROVNER, Circuit Judges.

COFFEY, Circuit Judge.

Mavo Leasing, Inc. ("Mavo"), an Illinois corporation, leases personnel to meat-packing plants. In 1990, three Mavo employees, intervenor-respondent Faustino Ramos ("Ramos"), Michael Beal ("Beal") and Francisco Murillo ("Murillo"), were discharged by Mavo for failing to pay union dues to the Production Workers Union of Chicago and Vicinity, Local 707 ("PWU"), required under the collective-bargaining agreement between the PWU and Mavo. Ramos and Murillo filed charges against the PWU alleging that it violated the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158, when it terminated the three employees without advising them of their right to dispute unauthorized union expenditures not related to collective-

bargaining. Administrative Law Judge Richard A. Scully found that the PWU never did have an affirmative obligation to inform non-union member employees of their right to object to union expenditures not related to collective-bargaining. On August 27, 1996, the National Labor Relations Board ("NLRB") found that the PWU violated section 8(b)(1)(A) and (2) of the NLRA by requesting and causing Mavo to fire the three employees. The PWU petitioned this Court for review of the NLRB decision and the NLRB filed a cross-application for enforcement of its order. We order the enforcement of the decision of the NLRB.

## I. BACKGROUND

In 1984, AMA Leasing, Ltd. ("AMA"), recognized the PWU as bargaining representative for its employees at the Donna meat packing plant in Forest Park, Illinois, and entered into a collective-bargaining agreement with the PWU. While AMA employees, Ramos and Beal joined the PWU and paid membership fees. Shortly thereafter, the NLRB determined that because the PWU was recognized by AMA before AMA began business operations, AMA's 1984 recognition of the PWU as its employees' bargaining representative was a violation of section 8(b)(1)(A) of the NLRA. The NLRB ordered the PWU to cease its activities as a bargaining representative and return all fees and dues collected from AMA employees, including Ramos and Beal. In 1986, Mavo assumed the meat packing operations at the Donna plant, and hired most of the employees who had been previously working for AMA at Donna. Subsequently, Mavo employees elected the PWU as their bargaining representative, which resulted in the certification of the PWU by the NLRB as the exclusive bargaining representative of Mavo's employees at the Donna plant. Although Ramos, Murillo and Beal were all Mavo employees, they refused to pay any union dues to the PWU.[1] Pursuant to the certification of the PWU, Mavo and the PWU entered into a collective-bargaining agreement with a

"union security" clause conditioning Mavo employees' employment on the payment of union dues to the PWU. The clause provided:

It shall be a condition of employment that all employees of Employer covered by this Agreement who are members of the Union in good standing on the date on which this Agreement is signed shall remain members in good standing, and those who are not members on the date on which this Agreement is signed shall, on the thirtieth (30th) day following the date on which the Agreement is signed, become and remain members in good standing in the Union. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after the date on which this Agreement is signed shall, on the thirty-first (31st) day following the beginning of such employment, become and remain members in good standing in this Union.

Under the agreement, all Mavo employees, union members or not, were obligated to submit dues to the union in order to finance the costs of the union's collective-bargaining activities. Beginning in late 1989, the PWU sent multiple notices to all employees covered by the collective-bargaining agreement that the payment of union dues was required as a condition of their employment at Mavo. Ramos, Beal and Murillo contend that they never received these notices. On January 23, 1990, a final notice was delivered to Ramos, Beal and Murillo stating that if payment of the dues was not made by February 7, 1990, their employment with Mavo would be terminated.

On February 6, Ramos contacted Sam Cozzo, PWU president and business representative, and requested an extension on the due date of his back dues. Ramos alleges that Cozzo extended the payment date to February 8, 1990, but was on vacation on the February date and failed to authorize another PWU representative to collect the payment from Ramos. Alternatively, Cozzo alleges that Ramos's request was premised on

---

1. From our reading of the record, Ramos and Beal refused to pay their union dues because they did not support the PWU's representation of workers at the Donna plant. Ramos and Beal supported a different union and were attempting to persuade other Mavo employees to join them.

Ramos's desire to contact his lawyer about the lawfulness of the payments and that Cozzo denied this request. Ramos, Beal and Murillo failed to pay the back dues by the due date set by the PWU. On February 8, 1990, Mavo, at the direction of the PWU, ended the employment of Ramos, Beal and Murillo.

Ramos and Murillo filed charges with the NLRB against the PWU for wrongfully causing Mavo to discharge them for failure to pay their dues in a timely fashion. Ramos and Murillo alleged that the Supreme Court's holding in *Communications Workers of America v. Beck*, 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988), required the PWU to notify them of their right to object to dues expenditures not germane to collective-bargaining before discharging them. In *Beck*, the Supreme Court held that section 8(a)(3) of the NLRA does not permit a union, over the objections of non-union member employees who pay union dues pursuant to collective-bargaining agreements, to expend funds collected pursuant to a union security clause on any activities unrelated to: (1) collective-bargaining; (2) contract administration; or (3) grievance adjustment.

Administrative Law Judge Scully found that the *Beck* case did not establish an affirmative obligation on the part of the PWU to provide notice to the employees of their right to dispute certain non-representation expenditures made by the PWU before discharge. Although Ramos and Beal were dues-paying members of the PWU while employees of AMA, the NLRB effectively terminated these memberships when it deemed the collective-bargaining agreement between AMA and the PWU unlawful. Ramos and Beal both signed a joint application for life insurance and union membership after the lawful collective-bargaining agreement was established, but no dues or fees were ever paid to the PWU by either Ramos or Beal. Similarly, Murillo never paid dues to the PWU. Two days before Mavo terminated his employment, Murillo gave a PWU steward a slip authorizing the PWU to deduct union dues from his paychecks, but the slip was never filed with the union.

On appeal, a three-member panel of the NLRB found that the PWU caused Mavo to unlawfully terminate the employment of Ramos, Beal and Murillo as non-union members and ordered the PWU to affirmatively request Mavo to reinstate their employment. In addition, the panel ordered the PWU to make Ramos, Beal and Murillo whole for any lost wages and benefits they suffered as a result of the PWU's conduct.

## II. ISSUE

The petitioner contends that the NLRB erred in determining that the PWU violated sections 8(b)(1)(A) and (2) of the NLRA by requesting and causing Mavo to discharge nonmembers Ramos, Beal and Murillo through enforcement of the union security agreement between Mavo and the PWU for nonpayment of union dues without first notifying them of their right to object to the union's expenditures that are not germane to collective bargaining under Beck.

## III. DISCUSSION

■■■ The Supreme Court has emphasized on more than one occasion that "the NLRB has the primary responsibility for developing and applying national labor policy." *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786, 110 S.Ct. 1542, 1549, 108 L.Ed.2d 801 (1990) (citations omitted).

> Because it is to the Board that Congress entrusted the task of applying the [NLRA's] general prohibitory language in the light of the infinite combinations of events which might be charged as violative of its terms, that body, if it is to accomplish the task which Congress set for it, necessarily must have authority to formulate rules to fill the interstices of the broad statutory provisions.

*Beth Israel Hospital v. NLRB*, 437 U.S. 483, 500–01, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978) (citation and internal quotation omitted). In circumstances where the NLRA is "silent or ambiguous" with respect to the issues involved, the NLRB's interpretation of what obligations the parties have under the NLRA will be affirmed if it is "based on a permissible construction of the [NLRA]."

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). "The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974). In addressing issues presented on appeal, "it is not necessary for a court to find that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981). Section 10(e) of the NLRA provides that the NLRB's findings of fact are "conclusive" if they are supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e). In considering the NLRB's decisions, the Supreme Court has previously held that the reviewing court may not displace the Board's choice between two fairly conflicting views, even if the court "would justifiably have made a different choice had the matter been before it de novo." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

In the case under consideration, the PWU contends that substantial evidence on the record as a whole does not support the NLRB's finding that the union violated the NLRA by directing Mavo to discharge the three nonmembers without first apprising them of their rights to object to the union's expenditures that were not germane to collective bargaining and to obtain a reduction in union fees for such activities.

Section 8(b)(1)(A) of the NLRA makes it an "unfair labor practice for a labor organization or its agents—to restrain or coerce employees in the exercise of the rights guaranteed in section 157 of [the NLRA]." Section 157 provides that employees

shall have the right to self-organization, to form, join, or assist labor organizations ... and shall also have the right to refrain from any or all such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section [8](a)(3)....

Thus, the NLRA specifically qualifies the section 157 right to refrain from joining or assisting labor organizations to the extent authorized by section 8(a)(3). Although section 8(a)(3) of the NLRA makes it an unfair labor practice for an employer to discriminate in regard to the hire or tenure of employment to encourage union membership, it also contains the following two provisions:

[N]othing in this [A]ct ... shall preclude an employer from making an agreement with a labor organization ... to require as a condition of employment membership therein .... *Provided further*, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization ... if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership.

Section 8(b)(2) of the NLRA further makes it an unfair labor practice for a union

*to cause or attempt to cause an employer to discriminate against an employee in violation of section [8](a)(3) ... or to discriminate against an employee with respect to whom membership ... has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.*

(Emphasis added).

■ As repeatedly explained by the Supreme Court in cases spanning the past thirty-five years,

the burdens of membership upon which employment may be conditioned are expressly limited to the payment of initiation fees and monthly dues. *It is permissible to condition employment upon membership, but membership, insofar as it has significance to employment rights, may in*

*turn be conditioned only upon payment of fees and dues. "Membership" as a condition of employment is whittled down to its financial core.*

NLRB v. General Motors Corp., 373 U.S. 734, 742, 83 S.Ct. 1453, 1459, 10 L.Ed.2d 670 (1963) (emphasis added). In essence, so long as an employee pays the dues and fees required, he is protected from discharge even if he refuses to join the union. *See NLRB v. Hershey Foods Corp.*, 513 F.2d 1083, 1084 (9th Cir.1975).

The notion of union security permitted under the auspices of the NLRA reflects a compromise between the desire "to insulate employees' jobs from their organizational rights," and Congressional recognition of the fact that in the absence of union security provisions, many employees would receive a "free ride" in that they would enjoy the benefits of union representation by way of collective-bargaining advantages, but at the same time refuse to contribute financial support to the union through the payment of dues. *Radio Officers' Union v. NLRB*, 347 U.S. 17, 40–41, 74 S.Ct. 323, 335–36, 98 L.Ed. 455 (1954). The risk of "free riders" arises as a result of section 9(a) of the NLRA, which provides that representatives

> designated or selected for the purposes of collective bargaining by the majority of the employees in [an appropriate unit] shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment. . . .

■ As the exclusive representative of *all* the unit employees, Congress, in creating the NLRA, imposed on the union "a duty fairly and in good faith to represent the interests of minorities within the unit." *Emporium Capwell Co. v. Western Addition Commun. Org.*, 420 U.S. 50, 64, 95 S.Ct. 977, 986, 43 L.Ed.2d 12 (1975). "It is a principle of general application that the exercise of a granted power to act in behalf of others involves the assumption toward them of a duty to exercise the power in their interest and behalf. . . ." *Steele v. Louisville & Nashville R. Co.*, 323 U.S. 192, 202, 65 S.Ct. 226, 232, 89 L.Ed. 173 (1944). The relationship between the union and those workers it represents has been likened to the duty owed

by a fiduciary to its beneficiaries. *See Teamsters v. Terry*, 494 U.S. 558, 567–68, 110 S.Ct. 1339, 1346, 108 L.Ed.2d 519 (1990). This Court has previously endorsed the notion that "a union seeking to enforce a union security clause has a fiduciary duty to deal fairly" with the employees against whom the union seeks to enforce the clause. *Larkins v. NLRB*, 596 F.2d 240, 245 (7th Cir.1979). Because the union is vested with comprehensive authority as the exclusive agent of the employees, the employee is entitled to depend on the labor organization. Out of this dependence necessarily arises a fiduciary duty that the union deal fairly with employees in enforcing union security clauses. *See NLRB v. Hotel, Motel & Club Employees' Union, Local 568*, 320 F.2d 254, 258 (3d Cir.1963).

■ A union violates section 8 of the NLRA, which provides that a union may not cause or attempt to cause an employer to discriminate against an employee on some ground other than his failure to tender the periodic dues, by requesting and causing the employer to discharge an employee for nonpayment of dues if it does not first inform the employee of the actions necessary to satisfy his union security obligations. *See id.* "At the minimum, th[e] duty [of fair representation] requires that the union inform the employee of his obligations in order that the employee may take whatever action is necessary to protect his job tenure." *Id.* Thus, the Supreme Court has repeatedly held that unions have the legal obligation to notify the employee of the amount of dues he owes, the method of calculating the dues owed, and the deadline for payment before the union can ask the employer to terminate the employee for failing to pay the dues. *See NLRB v. Local 1445, UFCW*, 647 F.2d 214, 217 (1st Cir.1981).

The modern outgrowth of the Supreme Court's "financial core" analysis in *General Motors* is the *Beck* decision. In *Beck*, 487 U.S. at 745, 108 S.Ct. at 2648, the Court held that the financial core membership that may be required under section 8(a)(3) of the NLRA does not include "the obligation to support union activities beyond those germane to collective bargaining, contract ad-

ministration, and grievance adjustment." Section 8(a)(3) of the NLRA "authorizes the exaction of only those fees and dues necessary to performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues." *Id.*, 487 U.S. at 762–63, 108 S.Ct. at 2657 (citation and internal quotation omitted). This Court addressed circumstances similar to those of Beck in the case of *Hudson v. Chicago Teachers Union, Local No. 1*, 743 F.2d 1187 (7th Cir.1984). In *Hudson*, non-union member employees of the Chicago Board of Education brought suit against the board, its members, its union, and its officers, challenging the procedure the board had established for determining the proportionate share of total union dues that non-union member employees were required to contribute to support the union as a collective-bargaining agent of all the board's employees. *See id.* at 1190. In holding that the board's fee determination procedure violated the employees' First Amendment rights, this Court stated that "[a union] may not . . . use money involuntarily extracted from the [non-union members] for the . . . advancement of . . . ideological causes not germane to [the union's] duties as collective bargaining representative." *Id.* (citation and internal quotation omitted).

In *California Saw*, 320 NLRB 224 (1995), the NLRB further refined its analysis of union security clauses. The Board found that a union seeking to apply a union security clause to unit employees "has an obligation under the duty of fair representation to notify them of their *Beck* rights before they become subject to obligations under the clause," and that it violates this duty of fair representation under the NLRA for a union to seek enforcement of a union security clause without providing such notice. *Id.* at 231, 235. The Board continued:

> [W]hen or before a union seeks to obligate an employee to pay fees and dues under a union-security clause, the union should inform the employee that he has the right to be or remain a nonmember and that nonmembers have the right (1) to object to paying for union activities not germane to the union's duties as bargaining agent and to obtain a reduction in fees for such activities; (2) to be given sufficient information

to enable the employee to intelligently decide whether to object; and (3) to be apprised of any internal union procedures for filing objections.

*Id.* at 233. The Board noted that under the Supreme Court's interpretation in *Beck*, employees who are not union members can no longer be required to pay full union dues as a condition of retaining their jobs under the union security clause. *See id.* at 225, 233. The Board found that the existence of the fiduciary duty owed by a union to unit employees required the union to provide accurate information to bargaining unit employees regarding the extent of their financial obligations to the union. *See id.* at 232–33. Furthermore, the Board cited the Third Circuit's decision in *Hotel, Motel & Club Employees' Union* in holding that a union may not lawfully demand payment of back dues which arose during a period during which there was no obligation to maintain membership. *See id.* at 232–33 n. 49. The Board concluded by stating that requiring a union to give notice of *Beck* rights to employees before attempting to enforce a union security clause against such employees "promotes the dissemination of accurate information to . . . employees regarding their financial obligations to the union." *Id.* at 233. Thus, under *California Saw*, a union is required to tender a notice of *Beck* rights to nonmember union employees before it can subject those employees to the monetary obligations imposed by a union security provision. The notice a union is required to furnish informs the employee that he has the right to object to paying for those union activities which are not germane to the union's duties as bargaining agent. This Court, in considering notice requirements, has reached a conclusion similar to that in *California Saw*. After the Supreme Court affirmed our decision in *Hudson* and the case was remanded to the district court, the school board instituted a new notice provision concerning union dues. The trial court ruled that the new provision was valid, and this Court affirmed, holding that "[t]he singular role of the federal courts in reviewing the adequacy of a fair share notice is to determine whether the notice gives the nonunion members enough information to challenge the basis for the fee."

*Hudson v. Chicago Teachers Union, Local No. 1*, 922 F.2d 1306, 1314 (7th Cir.1991). This Court requires a union's fee determination procedure to "provide adequate disclosure so that nonmember employees [are able to] gauge the propriety of the union's fees." *Id.* (citation and internal quotation omitted).

 In the case under consideration, it is undisputed that the petitioner union at no time tendered a notice of *Beck* rights to nonmembers Ramos, Beal or Murillo before seeking their discharge. Furthermore, the PWU also does not dispute that it requested and caused Mavo to discharge the three employees pursuant to the union security clause for failing to pay union dues. Nor does the union contest the propriety of the Board's holding in *California Saw* that a union violates the NLRA if it seeks the discharge of an employee for nonpayment of dues without first informing the employee of his *Beck* rights.[2] Accordingly, it follows that in the absence of such notice, the petitioner union could not seek to enforce the union security provision by causing or seeking to cause the discharge of Ramos, Beal and Murillo. On the contrary, the PWU, prior to the discharge of the employees, was required to inform them that they each had the right to remain nonmembers of the union and that as nonmembers, they had "the right (1) to object to paying for union activities not germane to the union's duties as bargaining agent and to obtain a reduction in fees for such activities; (2) to be given sufficient information to enable the employee to intelligently decide whether to object; and (3) to be apprised of any internal union procedures for filing objections." *California Saw*, 320 NLRB at 233. None of these mandated procedures took place in the case before us; instead, the three employees were provided identically worded notices on January 23, 1990, which merely informed them that they owed the union $143.50 for failing to make payment on their dues during the prior seven months. The notice also stated that unless the three paid "the delinquent dues on or before February 7, 1990, [Mavo] will be asked to discharge you." As discussed earlier, such a notice falls short of what is man-

dated under *Beck* and *California Saw*, and therefore, substantial evidence supports the NLRB's finding that the union violated the NLRA by causing Mavo to discharge the three employees.

 In defense, the union raises four arguments to counter the NLRB's position. The union contends that it believed the three were members of the union, that it did not spend any money on nonrepresentational activities, that it believed the three would have refused to pay dues even with notice of their *Beck* rights, and that *California Saw* should not be applied retroactively to the union's actions. However, the NLRA "precludes a reviewing court from considering an objection that has not been argued before the Board, 'unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.'" *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 311 n. 10, 99 S.Ct. 1123, 1129 n. 10, 59 L.Ed.2d 333 (1979) (quoting 29 U.S.C. § 160(e)). The PWU failed to preserve any of these four arguments for appellate review by failing to raise them before the NLRB. In defense of failing to raise the arguments before the NLRB, the PWU claimed during oral argument that in light of the administrative law judge's dismissal of the complaint, the PWU was not required to present its arguments as exceptions before the Board. However, in *Barton Brands, Ltd. v. NLRB*, 529 F.2d 793, 797, 801 (7th Cir.1976), this Court determined that an employer had waived its contentions on appeal where it had failed to file exceptions or cross-exceptions to the trial judge's decision, despite the fact that the judge had initially dismissed the complaint against the employer. "If this ground were accepted as an 'extraordinary circumstance,' however, little would be left of the statutory exception." *Detroit Edison*, 440 U.S. at 311 n. 10, 99 S.Ct. at 1129 n. 10. Thus, under *Barton Brands*, the administrative law judge's dismissal of the complaint against the PWU does not constitute an "extraordinary circumstance" justifying the PWU's failure to present its arguments to the NLRB. The union had ample reason to make its four arguments

---

**2.** Thus, the NLRB's finding that the PWU violated sections 8(b)(1)(A) and (2) of the NLRA by requesting and causing Mavo to discharge the

three employees is based entirely on uncontested facts.

to the NLRB notwithstanding the judge's dismissal of the complaint.

## IV. CONCLUSION

In summary, the NLRB correctly found that the PWU violated sections 8(b)(1)(A) and (2) of the NLRA by requesting and causing Mavo to discharge nonmembers Ramos, Beal and Murillo through enforcement of the union security agreement between Mavo and the PWU for nonpayment of union dues without first notifying them of their right to object to the union's expenditures that are not germane to collective bargaining under *Beck*. Furthermore, by not properly raising its arguments before the administrative law judge, the PWU waived its contentions that it believed the three workers were members of the union, that it did not spend any money on nonrepresentational activities, that the three would have refused to pay dues even with notice of their *Beck* rights, and that the NLRB erred in retroactively applying the decision in *California Saw*.

ORDER ENFORCED.