In the

# United States Court of Appeals
## For the Seventh Circuit

No. 07-3885

UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION,
AFL-CIO,

*Petitioner*,

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent*.

Petition for Review of an Order of the
National Labor Relations Board.
No. 26-CA-20861

ARGUED MAY 30, 2008—DECIDED SEPTEMBER 15, 2008

Before BAUER, RIPPLE and WOOD, *Circuit Judges*.

RIPPLE, *Circuit Judge*.  United Steel, Paper and Forestry,
Rubber, Manufacturing, Energy, Allied Industrial and
Service Workers International Union, AFL-CIO ("Union")

filed a charge with the National Labor Relations Board ("NLRB" or "Board") in which it alleged that Jones Plastic and Engineering Company ("Jones Plastic") had violated sections 8(a)(1) and (3) of the National Labor Relations Act ("NLRA" or "Act"). The Union claimed that Jones Plastic had violated the NLRA by refusing to reinstate economic strikers following the Union's unconditional offer to return to work because all of Jones Plastic's previously hired strike replacements were temporary employees. In its answer, Jones Plastic claimed that all of the strike replacements were permanent employees. The NLRB ruled in favor of Jones Plastic, overruling in part its prior decision in *Target Rock Corp.*, 324 NLRB 373 (1997), *enf'd*, 172 F.3d 921 (D.C. Cir. 1998), and it dismissed the Union's complaint. The Union now petitions for review of the Board's decision.

For the reasons set forth in this opinion, we deny the Union's petition for review.

# I

# BACKGROUND

## A. Facts

In April 2001, the Union was certified as the representative of a unit of employees at Jones Plastic's plant in Camden, Tennessee. After protracted negotiations for an initial collective bargaining agreement, 53 of the 75 employees in the collective bargaining unit began an economic strike on March 20, 2002.

In late March 2002, Jones Plastic began hiring replacement employees for the workers on strike. It hired a total of 86 replacements during the strike, and each replacement completed Jones Plastic's standard application for employment. Fifty-three replacements were hired in place of a specific striker, and each of these replacements signed a form reciting:

> I [name of replacement employee] hereby accept employment with Jones Plastic & Engineering Company, LLC, Camden division (hereafter "Jones Plastic") as a permanent replacement for [name of striker] who is presently on strike against Jones Plastic. I understand that my employment with Jones Plastic may be terminated by myself or by Jones Plastic at any time, with or without cause. I further understand that my employment may be terminated as a result of a strike settlement agreement reached between Jones Plastic and the U.S.W.A. Local Union 224 or by order of the National Labor Relations Board.

*Jones Plastic & Eng'g Co. & United Steel Workers*, 351 NLRB No. 11, *2 (Sept. 27, 2007). The remaining 33 replacements, who were hired in place of replacements who had quit, executed a form stating that the replacement was a permanent replacement for an unnamed striker.

The record reveals that Sylvia Page, the Human Resources Manager of Jones Plastic, informed one striker replacement that he was a full-time and permanent employee. Another replacement employee was hired in mid-May 2002, and he quit his old job to work for Jones Plastic as a replacement employee; this employee believed that

he was a permanent employee. A third replacement employee was hired in early June 2002, and Page told her that she was a full-time employee; she believed that she was a permanent employee because she received the same pay and benefits that the striking employees had received.

On July 31, 2002, the Union made, on behalf of the striking employees, an unconditional offer to return to work. That same day, Jones Plastic sent the Union a letter stating that it had a full complement of employees, including permanent replacements. Therefore, the letter stated, the strikers would not be reinstated immediately, but they would be placed on a preferential recall list. Between September 5 and September 19, Jones Plastic offered reinstatement to 47 strikers, of whom 18 accepted.

## B.  Proceedings Before the NLRB

The Union filed a charge alleging that Jones Plastic had violated sections 8(a)(1) and (3) of the NLRA when it refused to reinstate economic strikers after the Union's unconditional offer to return to work. It maintained that all of Jones Plastic's strike replacements were temporary, not permanent, employees. Jones Plastic defended by asserting that all of the strike replacements were permanent replacements. The NLRB ruled in favor of Jones Plastic and, in the course of its decision, overruled in part its prior decision in *Target Rock Corp.*, 324 NLRB 373 (1997), *enf'd*, 172 F.3d 921 (D.C. Cir. 1998). Accordingly, it dismissed the Union's complaint.

The majority and dissenting members of the Board agreed about the general principles governing the rights of economic strikers and replacement workers. An economic striker who unconditionally offers to return to work is entitled to reinstatement immediately unless the employer can show a legitimate and substantial business justification for refusing immediate reinstatement. *Jones Plastic*, 351 NLRB No. 11, at *5, *12 (citing *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378 (1967)). One such business justification is an employer's permanent replacement of economic strikers as a means of continuing its business operations during a strike. *Id.* (citing *Mackay Radio & Tel. Co. v. NLRB*, 304 U.S. 333, 345-46 (1938)). Thus, at the conclusion of a strike, an employer is not bound to discharge those hired to fill the places of economic strikers if it made assurances to those replacements that their employment would be permanent; permanence means that they would not be displaced by returning strikers. *Id.* The business justification defense is an affirmative defense, and the employer has the burden of proving that it hired permanent replacements. *Id.* To meet its burden, the employer must show a "mutual understanding of permanence" between itself and the replacements. *Id.*

Despite agreeing on these general principles, the majority and dissent differed on two interrelated issues: first, how an employer may prove that an at-will employee is permanent; and second, how the Board's decision in *Target Rock* affected the present case. The majority explained that, in its view,

> the *Target Rock* majority opinion suggests that [Jones Plastic's] at-will disclaimers informing employees that

their employment was for "no definite period" and could be terminated for "any reason" and "at any time, with or without cause" detract from its showing of permanent replacement status. We disagree. That view is based on a misreading of controlling law and is inconsistent with the basic scheme of the Act. We therefore decline to follow it.

*Id.* at *4. The majority held that the evidence that Jones Plastic had presented was sufficient to establish that the replacement employees were permanent. Specifically, it noted that: the forms that the replacement employees had signed stated that they were permanent replacements for striking employees; Jones Plastic told the striking employees that it had begun to hire permanent replacements; and its human resources manager had told at least one replacement that he was a permanent employee.

The majority also rejected the Union's petition for "a rule requiring employers that seek to hire at-will permanent replacements to explicitly advise employees that they cannot be discharged to make way for returning strikers." *Id.* at *6 n.9. The majority declined to adopt such a rule and held that Jones Plastic implicitly had advised new employees that they were permanent. In the Board's view, such implicit advice was sufficient:

While [the Union's explicit] language to that effect would support a finding of permanent replacement status, the Board has in the past eschewed a requirement that specific language be used to establish the required mutual understanding of "permanent" employee status. Where, as here, that understanding

is established without the use of such language, we will continue to find that strikers have been permanently replaced.

*Id.* (citation omitted).

The majority also rejected the Union's contention that, "for replacements to be permanent, there must be an enforceable contract between the replacement and the employer." *Id.*

> No requirement of this nature has ever been imposed by any Board or court decision. In *Belknap* [*v. Hale*, 463 U.S. 491 (1983)], the Supreme Court did not hold that there must be an enforceable contract to establish permanent replacement status. Instead, the Court held only that the Act did not preclude the enforcement of such a contract if it existed. Moreover, this proposed standard would make the determination of permanent replacement status dependent on whether an enforceable contract was formed under State law. The requirements for formation of such a contract will necessarily vary from one state to another, whereas the Board is charged with fashioning a uniform national labor policy.

*Id.*

The dissent, in contrast, believed that the majority had mischaracterized the *Target Rock* majority opinion:

> What then, does *Target Rock* stand for? It applied existing law concerning the requirement of a mutual understanding of permanent replacement to its particular facts. As for the [*Target Rock*] majority's state-

ment that the employer's expression of its at-will
policy did not support a finding of permanent status,
that is a truism. The [*Target Rock*] majority did not say
that at-will employment was incompatible with perma-
nent replacement, nor even that it was evidence
against a finding of permanent replacement. The
[*Target Rock*] majority merely stated that an employer's
avowal of an at-will policy does not lend support to
an affirmative defense of permanent employment.
Like the *Target Rock* majority, we regard that as "obvi-
ous."

Prior to *Target Rock*, the Board had held that at-will
employment was not incompatible with permanent
replacement status. *J.M.A. Holdings*, [310 NLRB 1349,
1358 (1993)]. In *Target Rock*, the Board did not overrule
*J.M.A. Holdings* or even mention it. In the final analysis,
neither *Target Rock* nor any other case stands for the
proposition that the majority purports to overrule. In
our view, the majority's strained effort to overrule a
nonexistent holding can be explained only by its
desire to reverse precedent.

Although we disagree with the majority's determina-
tion in the present case that the replacements were
permanent, that disagreement has nothing to do with
*Target Rock*, properly understood. Rather, it turns on
the facts of the case: [Jones Plastic] has simply failed
to establish the existence of the requisite mutual
understanding of permanent status.

*Jones Plastic*, 351 NLRB No. 11, at *9-10 (Liebman & Walsh,
Members, dissenting) (footnotes omitted).

With respect to the evidence in the case before it, the dissenting members believed that there was no mutual understanding of permanence between Jones Plastic and the replacement employees. The dissenting members explained:

> The replacements here were required to sign a statement stating that they were "permanent replacement[s]," but that they could be "terminated . . . at any time, with or without cause." The statement then stated, "I further understand that my employment may be terminated as a result of a strike settlement agreement . . . or by order [of] the National Labor Relations Board."

> Had [Jones Plastic] made only the latter statement, a finding that the replacements were permanent would follow. But [Jones Plastic] did not so limit itself. Rather, it told the employees not only that they could be displaced as a result of a strike settlement or Board order, but, additionally, that they could be discharged at any time for any reason. Taken together—and absent any other evidence of mutual understanding of permanence—[Jones Plastic's] statements did not reflect any commitment by [Jones Plastic] to the replacements. Certainly, the statements did not reflect a commitment that [Jones Plastic] would refuse, in the absence of a strike settlement, to reinstate strikers if it meant terminating replacements. Although [Jones Plastic] used the term "permanent replacement," it then undercut that statement by failing to give the replacements any assurance that they had rights vis-à-vis the

strikers. In the words of *Belknap* [*v. Hale*, 463 U.S. 491
(1983)], [Jones Plastic]'s statements, like those of the
employer in *Covington Furniture* [*Manufacturing Corp.*,
212 NLRB 214 (1974)], created a situation in which "the
replacement could be fired at the will of the employer
for any reason; the employer would violate no promise
made to a replacement if it discharged some of them to
make way for returning strikers." Or, in the simpler
formulation of the Board, [Jones Plastic], by its state-
ments, "kept [all] its options open." *Target Rock*, *supra*
at 375. As a result, the evidence fails to support a
finding that [Jones Plastic] and the replacements
shared an understanding that the replacements were
permanent.

*Id.* at *10 (penultimate alteration in original).


## II

## DISCUSSION

### A.  Standard of Review

   We review decisions of the NLRB deferentially. *Multi-Ad
Servs., Inc. v. NLRB*, 255 F.3d 363, 370-71 (7th Cir. 2001). The
Board's legal conclusions shall be upheld if they are not
"irrational or inconsistent with the Act." *NLRB v. Fin. Inst.
Employees*, 475 U.S. 192, 202 (1986); *NLRB v. Town &
Country Elec., Inc.*, 516 U.S. 85, 89-90 (1995); *Gen. Serv.
Employees Union v. NLRB*, 230 F.3d 909, 912 (7th Cir. 2000).
The Board's findings of fact will be reversed only if they
are not supported by substantial evidence on the record
taken as a whole, *Universal Camera Corp. v. NLRB*, 340 U.S.

474, 488 (1951); substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support the Board's conclusion," *Brandeis Mach. & Supply Co. v. NLRB*, 412 F.3d 822, 829 (7th Cir. 2005) (explaining that the Board's inferences and the conclusions that it draws from the facts also are entitled to deference). We have cautioned, nevertheless, that our deferential standard of review is not akin to the proverbial rubber stamp: "We must 'examine all of the evidence in context to ensure the Board's findings fairly and accurately represent the picture painted by the record.'" *Brandeis Mach. & Supply Co.*, 412 F.3d at 829 (quoting *NLRB v. Clinton Elecs. Corp.*, 284 F.3d 731, 737 (7th Cir. 2002)).

The determination whether Jones Plastic had a "mutual understanding of permanence" between itself and the replacements is a question of fact, and therefore it is an issue that we review under the substantial evidence standard. *See NLRB v. Augusta Bakery Corp.*, 957 F.2d 1467, 1473 (7th Cir. 1992).

## B.  The Reinstatement Rights of Economic Strikers

The Union and its amicus, the AFL-CIO, contend that the Board's decision is contrary to *Belknap, Inc. v. Hale*, 463 U.S. 491 (1983). In support of this argument, the Union points to the following language from *Belknap*:

> An employment contract with a replacement promising permanent employment, subject *only* to settlement with its employees' union and to a Board unfair labor practice order directing reinstatement of strikers,

would not in itself render the replacement a temporary employee subject to displacement by a striker over the employer's objection during or at the end of what is proved to be a purely economic strike.

*Id.* at 503 (emphasis added). According to the Union, *Belknap* requires that, in order to hire a permanent replacement, the employer must give the replacement an "enforceable promise" of permanence, i.e., a binding contract, by reference to state law, not to discharge the replacement in favor of a returning striker. In the Union's view, the NLRB's decision here is problematic because it permits an employer to manipulate the reinstatement procedure by discharging ostensibly permanent replacements to permit the recall of favored strikers. Because the employer would determine the basis for reinstatement in such a selective recall, continues the Union, the company's reason may be lack of union fervor. The Union also contends that Jones Plastic's offer of permanent employment was illusory because it allowed Jones Plastic to keep all of its options open. In the Union's view, at-will employment and an employer's right to hire permanent striker replacements may be harmonized only by requiring employers that seek to hire at-will, permanent replacements to advise employees *explicitly* that they cannot be discharged to make way for returning strikers but are otherwise at-will employees.[1]

---

[1] The Union suggests the following language: "I understand that my employment with [the employer] may be terminated by

(continued...)

The General Counsel submits that an employer may employ a permanent employee to replace a striker, while, at the same time, hiring that replacement employee on an at-will basis. The General Counsel believes that *Belknap* does not require an employer to give a replacement a legally enforceable agreement under state law in order to make him permanent. In his view, *Belknap* was limited to the issue of whether state causes of action were preempted by the Wagner Act; he emphasizes that there was no "at-will" disclaimer at issue in the case. The General Counsel also asserts that the Union's proposal—that the employer be required to state specifically that a replacement is employed at-will and may be terminated for any reason provided that the termination is not to make room for a returning striker—is too complicated to be workable.

After reviewing the applicable legal standards, we shall examine each of the Union's arguments in turn.

**1.**

Economic strikers retain their status as employees under section 2(3) of the NLRA, and they are entitled to

---

[1] (...continued)

myself or [the employer], at any time, with or without cause, for any reason other than to permit the return of a striker unless the return of such striker is required by a strike settlement agreement reached between [the employer] and [the union] or by order of the [NLRB]." Reply Br. at 16-17.

reinstatement at the conclusion of the strike. 29 U.S.C. § 152(3).[2] An employer who refuses to reinstate an economic striker upon his unconditional return to work therefore violates section 8(a)(1) and (3) of the Act, 29 U.S.C. §§ 158(1) & (3), unless the employer can demonstrate a "legitimate and substantial business justification for its failure to reinstate the employee." *NLRB v. Great Dane Trailers*, 388 U.S. 26, 34 (1967).

One legitimate and substantial business justification under which an employer may refuse to reinstate economic strikers is that it hired permanent replacements to replace the striking employees. *NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333, 345-46 (1938); *NLRB v. Mars Sales & Equip. Co.*, 626 F.2d 567, 572 (7th Cir. 1980). Since the early days of the Act, the Supreme Court has recognized that, during an economic strike, an employer has a "right to protect and continue his business" and that an employer does not commit an unfair labor practice by making "assurance[s] . . . to those who accepted employment during the strike that if they so desired their places might be permanent." *Mackay Radio*, 304 U.S. at 345-46. We have explained that "[t]he rationale for this exception to the general rule is that the employer's interest in continuing his business during a strike and the needed

---

[2] Section 152(3) states: "The term 'employee' shall include . . . any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment . . . ." *See also NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378 (1967).

inducement of permanent employment to obtain replacements is a sufficient business justification overcoming protection for economic strikers." *Mars Sales*, 626 F.2d at 573. In accordance with these principles, when an employer, in the course of an economic strike, has hired permanent employees to replace striking employees, the employer is not required to discharge the replacement employees at the end of the strike to make way for the formerly striking employees. *Fleetwood Trailer Co.*, 389 U.S. at 378. Instead, the employer may postpone reinstatement of these employees until positions become available for which they are qualified. *Mackay Radio*, 304 U.S. at 345-46.

The burden of proving that a replacement employee is permanent rather than temporary is on the employer. *Fleetwood Trailer Co.*, 389 U.S. at 378; *Great Dane Trailers*, 388 U.S. at 34-35. To discharge this burden, the employer must establish that it had a "mutual understanding" of permanence with the replacement employees. *In re Consol. Delivery & Logistics, Inc.*, 337 NLRB 524, 526 (2002), *enf'd*, 63 Fed. App'x 520 (D.C. Cir. 2003); *Augusta Bakery Corp.*, 957 F.2d at 1473. The key inquiry of the mutual understanding test is whether the employer and the replacement employees "intended that the workers' employment not terminate at the conclusion of the strike." *Solar Turbines, Inc.*, 302 NLRB 14, 15-16 (1991), *aff'd*, *Int'l Ass'n of Machinists & Aerospace Workers v. NRLB*, 8 F.3d 27 (9th Cir. 1993) (unpublished). An employer, therefore, "must show that the men who replaced the strikers were regarded by themselves and the [employer] as having received their jobs on a permanent basis." *Ga. Highway*

*Express*, 165 NLRB 514, 516 (1967). The Board has explained that, "[a]bsent evidence of a mutual understanding, [an employer]'s own intent to employ the replacements permanently is insufficient." *Consol. Delivery & Logistics, Inc.*, 337 NLRB at 526.

In making this determination, the Board consistently has considered all of the relevant circumstances. *Kansas Milling Co.*, 97 NLRB 219, 221 (1951) (examining the "entire record"). The Board, for example, has examined the employer's written and oral communications to the replacement employees as well as the context in which the communications occurred, *see, e.g., Hansen Bros. Enters.*, 279 NLRB 741, 741-42 (1986); *Augusta Bakery Corp.*, 957 F.2d at 1473, whether the replaced employees were transferees from other plants operated by the employer, *see, e.g., Ga. Highway Express*, 165 NLRB at 516-17, and whether the replacements considered themselves permanent employees or feared being replaced at the end of the strike, *see, e.g., Target Rock Corp.*, 324 NLRB 373, 374-75 (1997). Given this totality-of-the-circumstances approach, the Board has found that employees who are hired on a probationary basis or who are subject to further application procedures, physical examinations or drug testing are permanent employees for economic striker-replacement purposes *so long* as there is a mutual understanding that the resolution of the strike will not affect whether the employee is retained.[3]

---

[3] *See Solar Turbines, Inc.*, 302 NLRB 14, 15-16 (1991), *aff'd, Int'l Ass'n of Machinists & Aerospace Workers v. NRLB*, 8 F.3d 27 (9th
(continued...)

Consistent with these principles, the Board has held that an employee is not permanent where the employee's job depended not only on the employee's performance during the probationary period, but also on "when the strikers came back to work." *Cyr Bottle Gas Co.*, 204 NLRB 527, 527 (1973), *enf'd*, 497 F.2d 900 (6th Cir. 1974); *see also Augusta Bakery Corp.*, 957 F.2d at 1473 (holding that the replacements were temporary because, although the replacements were told that "if they worked out and did their job, they had a job," the testimony of the replacements indicated that they did not understand themselves to be permanent employees). A similar result was reached in *Covington Furniture*. There, the Board explained that

---

[3] (...continued)
Cir. 1993) (unpublished) (concluding that, if "the replacement workers and the [employer] intended that the workers' employment not terminate at the conclusion of the strike, the fact that the replacements had yet to complete these postinterview tests at the conclusion of the strike did not render them temporary workers subject to discharge"); *see also J.M.A. Holdings, Inc.*, 310 NLRB 1349, 1349 (1993) (same result under similar circumstances, except that the employees were expressly advised that they were employed on an "at-will" basis); *C.H. Guenther & Son, Inc.*, 174 NLRB 1202, 1212 (1969), *enf'd*, 427 F.2d 983, 985-86 (5th Cir. 1970); *Anderson, Clayton & Co.*, 120 NLRB 1208, 1214 (1958) (employees subject to a "6-month probationary period for all new employees during which [the employer] was free to discharge, transfer, or otherwise handle an employee without recourse" nevertheless were permanent employees); *Kansas Milling Co.*, 97 NLRB 219, 226 (1951) (30-day probationary period).

the evidence did not disclose "*any* promise by [the employer] to the replacements that they were permanent replacements." *Covington Furniture Mfg. Corp.*, 212 NLRB 214, 220 (1974), *enf'd*, 514 F.2d 995 (6th Cir. 1975) (emphasis added). Given the absence of evidence of such a promise, the Board noted that the "implication from the method of hiring[] and the learning periods needed[] was that the jobs might well be temporary." *Id.* Finally, in *Target Rock*, the case that the Board here overruled in part, the employer had placed a recruiting advertisement stating that "all positions *could* lead to permanent full-time *after the strike*." 324 NLRB at 373 (second emphasis added). The record did not establish, the Board explained, that "the hires had reason to know, either from filling out the application and notice of employment forms, having to pass drug and alcohol screening tests, or receiving various employment benefits, that they were permanent employees." *Id.* Indeed, at one point during negotiations with the union, the employer referred to the replacements as "not permanent." *Id.* at 374. The Board noted that the "at-will" disclaimer used by the employer "obviously [did] not support the [employer's] position that the striker replacements were permanent." *Id.* (citation omitted). Although the replacement employees had been told periodically that they were "permanent at-will employees," these assurances alone did not establish that the employer had a mutual understanding with the replacements that the resolution of the strike would not affect the replacements' employment status. *Id.*

The results reached in these cases support comfortably the Board's rationale for allowing an employer to refuse

to discharge permanent replacements in favor of striking employees. An employer has a right to continue to operate his business during an economic strike. *See Mackay Radio*, 304 U.S. at 345. To recruit replacement personnel during such a strike, an employer may need to assure those replacements that their positions do not depend wholly upon the resolution of the strike.[4] *Mars Sales*, 626 F.2d at 573. Thus, an employer has a "legitimate and substantial business justification" for refusing to discharge replacement employees with whom the employer established a mutual understanding of permanence with respect to returning strikers. *Fleetwood Trailer Co.*, 389 U.S. at 378. As long as this mutual understanding is established through an examination of the totality of the circumstances, an employer may impose other conditions of employment such as probationary periods, further testing and at-will employment—conditions to which the replacements would have been subjected even in the absence of a possibility that returning economic strikers might seek reinstatement in the jobs for which the replacements are being hired. *See Solar Turbines*, 302 NLRB at 15-16.

---

[4] We say "wholly" upon the resolution of the strike because, as we shall explain in the next subsection, the Supreme Court in *Belknap v. Hale*, 463 U.S. 491, 503 (1983), permitted an employer to condition an offer of permanent employment on "settlement with its employees' union and [on] a Board unfair labor practice order directing reinstatement of strikers."

**2.**

We do not believe that the Supreme Court's decision in *Belknap* is controlling. In *Belknap*, there was an economic strike, and the company sought to hire permanent replacements. It placed an advertisement seeking applicants to "permanently replace striking warehouse and maintenance employees." 463 U.S. at 494. At all times during the strike, even after the NLRB regional director filed a complaint alleging that the employer had committed an unfair labor practice, the replacements were assured that they were permanent; no "at-will" disclaimer was at issue in the case. Subsequently, after negotiating with the union, the employer agreed to discharge the permanent replacements in favor of the striking employees. The permanent striker replacements sued in state court alleging breach of contract and misrepresentation. The Supreme Court granted certiorari to decide whether the NLRA preempted the replacements' state causes of action.

The Court held that there was no preemption of the state court actions in question. Federal law permits, but does not require, an employer to hire replacements during an economic strike, the Justices explained; if those replacements are "permanent," within the meaning of federal labor law, then the employer need not discharge them in order to reinstate the strikers. As such, the Court found preemption untenable:

> But when an employer attempts to exercise this very privilege by promising the replacements that they will not be discharged to make room for returning strikers, it surely does not follow that the

employer's otherwise valid promises of permanent employment are nullified by federal law and its otherwise actionable misrepresentations may not be pursued. We find unacceptable the notion that the federal law on the one hand insists on promises of permanent employment if the employer anticipates keeping the replacements in preference to returning strikers, but on the other hand forecloses damage suits for the employer's breach of these very promises. Even more mystifying is the suggestion that the federal law shields the employer from damages suits for misrepresentations that are made during the process of securing permanent replacements and are actionable under state law.

*Id.* at 500 (citations omitted). The Court rejected the employer's argument that the prospect of entertaining suits filed by fired replacement employees would burden the employer's right to hire permanent replacements. This argument, the Court believed, is

no[] more than [an] argument[] that . . . promises of permanent employment that under federal law the employer is free to keep, if it so chooses, are essentially meaningless. It is one thing to hold that the federal law intended to leave the employer and the union free to use their economic weapons against one another, but is quite another to hold that either the employer or the union is also free to injure innocent third parties without regard to the normal rules of law governing those relationships. We cannot agree with the dissent that Congress intended such a lawless regime.

The argument that entertaining suits like this will interfere with the asserted policy of the federal law favoring settlement of labor disputes fares no better. This is just another way of asserting that the employer need not answer for its repeated assurances of permanent employment or for its otherwise actionable misrepresentations to secure permanent replacements. We do not think that the normal contractual rights and other usual legal interests of the replacements can be so easily disposed of by broad-brush assertions that no legal rights may accrue to them during a strike because the federal law has privileged the "permanent" hiring of replacements and encourages settlement.

*Id.*

In a part of *Belknap* that the Union believes critical to the present case, the Supreme Court recognized that its holding—allowing innocent third-parties to sue in state court for breach of contract or misrepresentation—could prove costly to employers who hire permanent replacement employees and thereby inhibit settlements between employers and unions. *Id.* at 505 & n.9. The Court, accordingly, indicated that employers could "condition" their offers of "permanent" employment. The Court held that an employer may hire a permanent replacement but nevertheless state explicitly that the permanent replacement may lose the job if the employer settles with the striking employees' union or if the NLRB issues an unfair labor practice order directing reinstatement of strikers. In the words of the Court:

An employment contract with a replacement promising permanent employment, subject only to settlement with its employees' union and to a Board unfair labor practice order directing reinstatement of strikers, would not in itself render the replacement a temporary employee subject to displacement by a striker over the employer's objection during or at the end of what is proved to be a purely economic strike. The Board suggests that such a conditional offer "might" render the replacements only temporary hires that the employer would be required to discharge at the conclusion of a purely economic strike. But the permanent-hiring requirement is designed to protect the strikers, who retain their employee status and are entitled to reinstatement unless they have been permanently replaced. That protection is unnecessary if the employer is ordered to reinstate them because of the commission of unfair labor practices. It is also meaningless if the employer settles with the union and agrees to reinstate strikers. But the protection is of great moment if the employer is not found guilty of unfair practices, does not settle with the union, or settles without a promise to reinstate. In that eventuality, the employer, although he has prevailed in the strike, may refuse reinstatement only if he has hired replacements on a permanent basis. If he has promised to keep the replacements on in such a situation, discharging them to make way for selected strikers whom he deems more experienced or more efficient would breach his contract with the replacements. Those contracts, it seems to us, create a sufficiently

permanent arrangement to permit the prevailing employer to abide by its promises.

*Id.* at 503-04 (citation omitted). In a footnote, the Court explained that the Board's decision in *Covington Furniture* was not to the contrary. The Court noted that in *Covington Furniture* "the replacements could be fired at the will of the employer for any reason" and that "the employer would violate no promise made to a replacement if he discharged some of them to make way for returning strikers, even if the employer was not required to do so by the terms of a settlement with the union." *Id.* at 505 n.8 (citing *Covington Furniture Mfg. Corp.*, 212 NLRB at 214). The Union relies on this language to argue that an employer cannot hire a permanent replacement unless it offers the replacement a *binding contract* under state law.

We are not persuaded by the Union's contention that *Belknap* is controlling under the circumstances of the present case. The *Belknap* Court held that federal labor law did not preempt causes of action brought in state court by aggrieved replacement employees. That holding, to be sure, led the Court to alter the standard for permanence, and the alteration of that standard was a major point of contention among the various opinions written in the case. *Compare Belknap*, 463 U.S. at 503-04 & n.8 (opinion of White, J.), *with id.* at 513-17, 522-23 (Blackmun, J., concurring), *and id.* at 541 n.13 (Brennan, J., dissenting). Despite its alteration of the standard of permanence, however, the Court did not, as the Union submits, hold that an employer may avail itself of permanent replacement employees only if it offers those em-

ployees a binding contract actionable under state law. Indeed, rather than tightening the standard for permanence, as the Union contends, the Court actually *loosened* that standard: It allowed an employer to condition its offers of permanent employment on its settlement with the union and on an NLRB unfair labor practice order directing reinstatement of strikers. *See id.* at 513 (Blackmun, J., concurring) (criticizing the Court's approach of allowing employers to condition their offers of permanent employment because "[s]uch a promise bears little resemblance to a promise of permanent employment"); *id.* at 541 n.13 (Brennan, J., dissenting) ("It is difficult to imagine . . . how a conditional offer like the one described by the Court could be construed as an offer of permanent employment."). Shortly before the dictum that the Union cites regarding *Covington Furniture*, the Court recognized that simply because "the offer and promise of permanent employment are conditional does not render the hiring any less permanent if the conditions do not come to pass," and it also noted that "[a]ll hirings are to some extent conditional." *Id.* at 504 n.8; *see also Gibson Greetings, Inc. v. NLRB*, 53 F.3d 385, 390 (D.C. Cir. 1995) ("Although . . . the new 'associates' could be laid-off in the event of a business slowdown . . . , such conditions do not render an offer of employment non-permanent." (citing *Belknap*, 463 U.S. at 503-04 & n.8)).

*Belknap*'s recognition that an employer could hire permanent employees for economic striker-replacement purposes is consistent with then-existing Board precedent. As we have recounted, the Board consistently has allowed employers to hire permanent employees while concomitantly imposing certain conditions on their re-

tention, so long as there is a mutual understanding that the employer's desire to reinstate a striker will not cause the replacement employee's discharge. *See Anderson, Clayton & Co.*, 120 NLRB 1208, 1214 (1958) (employees subject to a "6-month probationary period for all new employees during which it was free to discharge, transfer, or otherwise handle an employee without recourse" nevertheless was a permanent employee).[5] The Board never has adopted a requirement that employers must offer the putative permanent employees a binding contract of employment under state law;[6] nor has the Board adopted

---

[5] *See also J.M.A. Holdings, Inc.*, 310 NLRB at 1349 (concluding that replacement workers were permanent—despite the fact that the employees were expressly advised that they were employed on an at-will basis and that "they had not completed the employment application, physical, and drug test"—because there was a mutual understanding that the resolution of the strike would not affect whether the employees were retained); *Kansas Milling Co.*, 97 NLRB at 226; *cf. NLRB v. Augusta Bakery Corp.*, 957 F.2d 1467, 1473 (7th Cir. 1992) (holding that the replacements were temporary because, although the replacements were told that "if they worked out and did their job, they had a job," the testimony of the replacements indicated that they did not understand themselves to be permanent employees); *Cyr Bottle Gas Co.*, 204 NLRB 527, 527 (1973) (holding that an employee is not permanent where the employee's job depended not only on the employee's performance during the probationary period, but also on "when the strikers came back to work").

[6] We note that, despite the Union's reliance on the *Belknap* Court's characterization of *Covington Furniture*, that case does

(continued...)

such a rule subsequent to *Belknap*.[7]

Consequently, we cannot accept the Union's argument that *Belknap* decided that an employer may avail itself of permanent replacement employees only if it offers those employees a binding contract actionable under state law.

---

[6] (...continued)
not support the Union's position. In *Covington Furniture*, the Board did not have an opportunity to consider the effect of an at-will employment disclaimer on an employer's claim that it had hired permanent employees because there was no at-will employment disclaimer at issue. Moreover, and more to the point, the Board found that the employer's hiring offer was "subject to cancellation" at the employer's choice because there was no evidence of "*any* promise by [the employer] to the replacements that they were permanent replacements." *Covington Furniture Mfg. Corp.*, 212 NLRB 214, 220 (1974), *enf'd*, 514 F.2d 995 (6th Cir. 1975) (emphasis added). Given the absence of evidence of such a promise, the Board further noted, the "implication from the method of hiring, and the learning periods needed, was that the jobs might well be temporary." *Id.*

[7] In *Solar Turbines*, for example, the Board relied on *Belknap*'s observation that all hirings are to some extent conditional in holding that "so long as the replacement workers and the [employer] intended that the workers' employment not terminate at the conclusion of the strike, the fact that the replacements had yet to complete these postinterview tests at the conclusion of the strike did not render them temporary workers subject to discharge." 302 NLRB at 15-16 (footnote omitted).

**3.**

The Union next submits a series of related arguments for why the Board's decision is inconsistent with the Act. Echoing the observations of one of the dissenting Board members, it contends that Jones Plastic's purported offer of permanent employment was illusory for purposes of federal labor law because it allowed the company to keep all of its options open and therefore permitted Jones Plastic to manipulate the reinstatement procedure by discharging permanent replacements in order to recall selected strikers under whatever standard suited the company. An employer could decide, for example, to reinstate strikers who exhibit a lack of union fervor.

We cannot accept the Union's assertion that Jones Plastic's offer of permanent employment was illusory because it somehow kept all of Jones Plastic's options open. Such a characterization misapprehends the Board's decision. Although the Board overruled its previous decision in *Target Rock*, it did so only to the extent that *Target Rock* "suggests that at-will employment is inconsistent with or detracts from an otherwise valid showing of permanent replacement status." *Jones Plastic*, 351 NLRB No. 11, at *10. Indeed, the dissenting Board members agreed with the majority that an employer's "recitation of at-will language is not fatal to its position" that it hired permanent replacements. *Id.* at *14 n.13. Importantly, the Board did *not* overrule the totality-of-the-circumstances approach that it historically has employed to determine whether an employer has established a "mutual understanding of permanence" with the replacement employ-

ees. Under this totality-of-the-circumstances approach, Jones Plastic could not have fired some of the replacements in favor of some of the strikers while denying reinstatement to the remainder of the strikers on the ground that the replacements were permanent. Plainly, such conduct would constitute nearly incontrovertible evidence that the replacements—despite their label as "permanent"—were not *in fact* permanent. Thus, contrary to the dissenting Board members' view and the Union's argument, Jones Plastic has not kept all of its options open.

Indeed, there were additional checks, as a practical matter, on Jones Plastic's options. Had it engaged in such conduct, Jones Plastic would have risked a promissory fraud or breach of contract lawsuit brought by the discharged replacements under Tennessee law. Based on Jones Plastic's representations to the replacement employees that they were permanent employees in relation to the strikers whom they were being hired to replace, these discharged permanent employees would have been free, *see Belknap*, 463 U.S. at 503, to argue to a state court that Jones Plastic was liable under state law for firing them in favor of the returning strikers. *See, e.g.*, *Hudson v. Insteel Indus., Inc.*, 5 Fed. App'x 378, 386 (6th Cir. 2001) (unpublished) (noting that, "Tennessee's employment-at-will doctrine notwithstanding, a promissory fraud claim may go forward, in the absence of an employment contract, where 'an employer makes an offer of long-term, permanent employment with no present intention of keeping its promises'" (quoting *Lee v. Hippodrome Oldsmobile, Inc.*, 1997 WL 629951, at *2 (Tenn. Ct. App. Oct. 14, 1997))). Additionally, had the replace-

ment employees been discharged in favor of the returning strikers, the replacements would have had an arguable claim for breach of contract.[8] We conclude, accordingly, that Jones Plastic's offer of permanent employment did not allow Jones Plastic to keep all of its options open. We emphasize, nevertheless, our determination earlier in this opinion that, under *Belknap*, an offer of employment may be considered permanent for purposes of federal labor law without necessarily being an enforceable contract under state law.

The Union further contends that, under the Board's decision, an employer could manipulate the reinstatement procedure by discharging permanent replacements to permit the recall of selected strikers, such as those who exhibit a lack of union fervor or who have greater skills or work ethic. We agree with the Union that it

---

[8] The document that the replacement employees signed when they accepted employment with Jones Plastic stated: "I [name of replacement employee] hereby accept employment with Jones Plastic . . . as a permanent replacement for [name of striker] who is presently on strike against Jones Plastic. I understand that my employment with Jones Plastic may be terminated by myself or by Jones Plastic at any time, with or without cause." *Jones Plastic & Eng'g Co. & United Steel Workers*, 351 NLRB No. 11, *4 (Sept. 27, 2007). One possible interpretation of this language is that the statement of permanence contained in this form is an exception to the at-will language and therefore creates an enforceable contract that Jones Plastic will not discharge the replacement employee in favor of a returning striker. *See infra* note 10.

would be problematic if an employer could manipulate the reinstatement process to discriminate against employees who demonstrate a greater affinity for a union. However, the premise upon which this argument is based—that the Board's decision sanctions such conduct—is unsound. An employer who discharges ostensibly permanent replacements in favor of strikers who are less enthusiastic about the union would commit an unfair labor practice under section 8(a)(3) of the NLRA. *NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333, 346-47 (1938); *Aqua-Chem., Inc. v. NLRB*, 910 F.2d 1487, 1489 (7th Cir. 1990). In *Mackay Radio*, the Supreme Court held unequivocally that an employer who refuses to reinstate strikers on the basis of their activity in a union violates the NLRA. *Mackay Radio*, 304 U.S. at 346-47.

The Union also submits that the Board's decision contravenes the Act because it allows employers to discharge ostensibly permanent replacements in favor of formerly striking employees who have greater skills or work ethic. As we have explained, a union would be free to argue, under the Board's totality-of-the-circumstances approach, that an employer's discharging of select employees in favor of formerly striking employees with greater skills may well constitute evidence that the putatively permanent employees were not actually permanent. Furthermore, an employer who engaged in such conduct might subject itself to contract liability in the state courts; this potential liability may serve as a check on an employer's ability to pursue this course. In any event, there are no allegations that Jones Plastic engaged in this sort of manipulation here, and the NLRB is the appropriate institutional actor to address this

issue in the first instance, should it arise. As the Supreme Court has reminded us:

> [I]n many . . . contexts of labor policy, the ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review.

*NLRB v. Kentucky River Cmty. Care, Inc.*, 532 U.S. 706, 725 n.5 (2001) (internal quotation marks, citations and alterations omitted).

**4.**

Finally, the Union concedes that at-will employment can be harmonized with federal labor law's standard of permanence; it petitions, however, for a rule requiring that employers *expressly* advise employees that they cannot be discharged to make way for returning strikers but that they otherwise are employed on an at-will basis. The Union proposes the following language: "I understand that my employment with [the employer] may be terminated by myself or [the employer], at any time, with or without cause, for any reason other than to permit the return of a striker unless the return of such striker is required by a strike settlement agreement reached between [the employer] and [the union] or by order of the [NLRB]." Reply Br. at 16-17.

The Supreme Court repeatedly has emphasized that "the NLRB has the primary responsibility for developing and applying national labor policy." *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786 (1990) (noting that the NLRB "must have authority to formulate rules to fill the interstices of the broad statutory provisions" with which "Congress entrusted" it); *see also Holly Farms Corp. v. NLRB*, 517 U.S. 392, 398-99 (1996). Consequently, when the NLRA is "'silent or ambiguous' with respect to the issues involved, the NLRB's interpretation of what obligations the parties have under the NLRA will be affirmed if it is 'based on a permissible construction'" of that statute. *Prod. Workers Union v. NLRB*, 161 F.3d 1047, 1050 (7th Cir. 1998) (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)). Under these circumstances, the Board's legal conclusions shall be upheld if they are not "irrational or inconsistent with the Act." *NLRB v. Fin. Inst. Employees*, 475 U.S. 192, 202 (1986).

The NLRA does not define what constitutes a permanent striker replacement; it does not delineate what evidence may be used to establish that an employee is permanent; and it is silent as to how offers of permanent employment interact with at-will employment, a ubiquitous, if not uniform, mode of employment. Under these circumstances, we must uphold the Board's legal conclusions on how best to proceed unless its conclusions are "irrational or inconsistent" with the NLRA. *Fin. Inst. Employees*, 475 U.S. at 202. Under this standard of review, we cannot accept the Union's contention that the Board should have adopted a rule requiring that employers

expressly advise employees that they cannot be discharged to make way for returning strikers but that they otherwise are employed on an at-will basis. Indeed, the Board spoke directly to this issue and determined that such a proposal would not be a satisfactory way of dealing with situations arising in this area. The Board did note that the language that the Union proposed "would support a finding of permanent replacement status," but it also pointed out that it has "eschewed a requirement that specific language be used to establish the required mutual understanding of 'permanent' employee status." *Jones Plastic*, 351 NLRB No. 11, at *9 n.9. The Board's determination that a totality-of-the-circumstances approach is preferable to a rigid formulation is certainly worthy of our deference. As the Board's treatment of the issue in this case also underlines, the approach suggested by the Union would also have the effect of implying that, in order to be considered permanent, an employee must have a contract of employment that guarantees permanency, a requirement that the Board consistently has refused to require as a matter of federal labor policy.[9] In short, the Board's conclusions are not unreasonable or inconsistent with the NLRA.

---

[9] *Jones Plastic*, 351 NLRB No. 11, at *9 n.9 (United Steel's proposed rule "would make the determination of permanent replacement status dependent on whether an enforceable contract was formed under State law. The requirements for formation of such a contract will necessarily vary from one state to another, whereas the Board is charged with fashioning a uniform labor policy.").

## C.  Substantial Evidence

As we already have noted, the Board acted well within its authority in determining that the question of whether a replacement employee should be considered "perma-nent" in the context of ascertaining the rights of workers returning from an economic strike should be governed by a totality-of-the-circumstances test. Applying that test in this case, the Board interpreted the form signed by the replacement employees and concluded that the document evinced a mutual understanding of permanence between the replacement employees and the employer. The Board's construction of the document is a reasonable one, and therefore it is entitled to our deference. *NLRB v. Champion Labs, Inc.*, 99 F.3d 223, 227 (7th Cir. 1996) (noting that, "in analyzing [the Board's] application of law to particular facts," this court defers to the Board's inferences and the legal conclusions that it draws from those facts); *Augusta Bakery*, 957 F.2d at 1474 ("Where two inferences can be drawn . . . it is within the Board's province to determine which is appropriate."); *see also Brandeis Mach. & Supply Co. v. NLRB*, 412 F.3d 822, 829 (7th Cir. 2005). Notably, the Board's construction of the form is consistent with well-established interpretative principles.[10]

---

[10] *Cf.* Edwin W. Patterson, *The Interpretation and Construction of Contracts*, 64 Columb. L. Rev. 833, 854-55 (1964) ("If one of those provisions is general enough to include the specific situation to which the other is confined, the specific provision will be deemed to qualify the more general one, that is, to state an exception to it."); *see also Townsend v. Little*, 109 U.S. 504, 511

(continued...)

Faithful to the totality of circumstances approach that it historically has used, the Board did not rely simply on its interpretation of Jones Plastic's hiring form. Additionally, it evaluated the other circumstances in the case and determined that this evidence also favored a determination of permanence. Jones Plastic's human resources manager had told one replacement that he was a permanent employee, and Jones Plastic presented evidence that at least three of the striker replacements had considered themselves permanent employees in relation to the strikers. In all of its communications with the Union, moreover, Jones Plastic consistently had maintained that the replacement employees were permanent. The at-will disclaimer in the form, clearly the most significant piece of evidence that might have supported a contrary determination, was construed reasonably by the Board as not allowing Jones Plastic to terminate the replacements in favor of the returning strikers.

Given the totality of the circumstances, therefore, the Board reasonably concluded that Jones Plastic had a

---

[10] (...continued)

(1883) ("[G]eneral and specific provisions, in apparent contradiction . . . and without regard to priority of enactment, may subsist together, the specific qualifying and supplying exceptions to the general."); *Farnham v. Windle*, 918 F.2d 47, 49 (7th Cir. 1990) ("[W]here there are two statutory provisions, one of which is general and designed to apply generally, and the other is specific and relates to only one subject, the specific provision must prevail and must be treated as exception [sic] to the general provision." (internal quotation marks and citation omitted)).

mutual understanding of permanence with the replacement employees, despite the replacements' otherwise at-will status. Accordingly, the Board properly concluded that Jones Plastic had proffered a legitimate and substantial business justification for refusing to discharge the replacement employees at the end of the strike to make way for the formerly striking employees. *See Fleetwood Trailer Co.,* 389 U.S. at 378.

## Conclusion

Because the determination of the Board has a reasonable basis in law and is supported by substantial evidence, the petition for review is denied.

PETITION FOR REVIEW DENIED

WOOD, *Circuit Judge*, concurring in the judgment. The Union may not realize it upon its first reading of the majority's opinion, but it has in fact won the war even if it lost the battle over what happened at Jones Plastic and Engineering Company (the Company). My concern over the majority's opinion is that portions of it might be read to endorse more of the Board's legal approach in this case than I believe it actually has done. I thus write to summarize what I believe we are holding, and why I am

concurring in the ultimate judgment to deny the Union's petition for review.

The question before the Board, succinctly put, was whether the workers that Jones Plastic hired during the Union's economic strike were permanent or temporary. If they were permanent, then under well-established rules, the Company was under no obligation to release them when the Union made its unconditional offer to return the striking employees to work. See *Mackay Radio & Tel. Co. v. NLRB,* 304 U.S. 333, 345-46 (1938). If the replacements were temporary, then the employer cannot demonstrate the "legitimate and substantial business justifications" for refusing to reinstate the strikers that is necessary to avoid a finding of an unfair labor practice. See *NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 378 (1967), quoting *NLRB v. Great Dane Trailers,* 388 U.S. 26, 34 (1967). In this case, the Board had to decide how to apply these rules to a reinstatement offer that promised only employment at will and that emphasized that the replacement's "employment with Jones Plastic may be terminated by [the replacement] or by Jones Plastic at any time, with or without cause." See *ante,* at 3.

Both the Union and the two dissenting members of the Board are concerned that an offer like this one erases the distinction between a permanent and a temporary replacement. As the dissenters put it, the Jones Plastic offer "created a situation in which 'the replacement could be fired at the will of the employer for any reason; the employer would violate no promise made to a replacement if it discharged some of them to make way for returning

strikers.'" *Jones Plastic & Eng'g Co. & United Steel Workers,* 351 NLRB No. 11, at *10 (Sept. 27, 2007). The Union argues that such open-ended discretion on the part of the Company would allow it to discharge just enough replacement workers to create job openings for striking workers who had become disenchanted with the Union or who promised to oppose further unionization efforts. It points out that the classic definition of employment "at will" is an arrangement under which "absent express agreement to the contrary, either employer or employee may terminate their relationship at any time, for any reason. . . . Such employment relationship is one which has no specific duration, and such a relationship may be terminated at will by either the employer or the employee, for or without cause." See BLACK'S LAW DICTIONARY at 525 (6th ed. 1990). Although there are some narrow limitations on the employer's discretion—for example, Illinois recognizes an exception for cases in which an at-will employee is fired because he reported dangerous or illegal activities at work, see *Robinson v. Alter Barge Line, Inc.,* 513 F.3d 668, 671 (7th Cir. 2008), and at-will employees may state claims for racial discrimination in employment under 42 U.S.C. § 1981, see *Walker v. Abbott Laboratories,* 340 F.3d 471, 476 (7th Cir. 2003)—this case presents the question whether a company is entitled to exercise its discretion to fire an at-will employee solely because it wants to bring back strikers in the absence of a formal settlement or order from the Board. In my view, the majority has answered that question "no," for the reasons I outline below.

First, the majority reaffirms the rule that the burden of proving that a replacement worker is permanent lies on the

employer. *Ante,* at 15. Second, it accepts the Board's "totality of the circumstances" approach to the determination whether a position is permanent or temporary. *Ante*, at 16. Third, just as both the majority and dissenting members of the Board did, the majority holds that it is *possible* for an at-will employee to be a permanent replacement: under all the circumstances, some will be, and some will not be. Finally, and critically, the majority rules that:

> [T]he Board consistently has allowed employers to hire permanent employees while concomitantly imposing certain conditions on their retention, *so long as there is a mutual understanding that the employer's desire to reinstate a striker will not cause the replacement employee's discharge.*

*Ante,* at 25-26 (emphasis added). The language in italics is conceptually identical to the rule for which the Union argued here. As the majority notes, *ante*, at 13 n.1, the Union took the position that the following language would address its concerns:

> I understand that my employment with [the employer] may be terminated by myself or [the employer], at any time, with or without cause, for any reason other than to permit the return of a striker unless the return of such striker is required by a strike settlement agreement reached between [the employer] and [the union] or by order of the [NLRB].

The Board majority rejected the Union's solution, saying that it was not prepared to require "specific language" of any type. In my view, that is not what the Union was

requesting; it was saying only that the *idea* conveyed in the language it suggested had to be communicated to the replacement workers, and it was offering one verbal formulation that would do the job. The majority is willing to accept the Board's argument that the Union's suggestion was "too complicated," *ante* at 13 and 33, but I do not. No matter—as the Board itself recognized, the precise language is not the point: it is the concept that must be communicated to the replacement worker. The majority suggests that "[o]ne possible interpretation of [the Jones Plastic form] is that the statement of permanence contained in this form is an exception to the at-will language and therefore creates an enforceable contract that Jones Plastic will not discharge the replacement employee in favor of a returning striker." *Ante*, at 30 n.8. I agree with them that this is "one possible interpretation." Moreover, reading the majority's opinion as a whole, I conclude that it is the necessary interpretation. That is the only approach that is consistent with the majority's observation that "[u]nder [the] totality-of-the circumstances approach, Jones Plastic could not have fired some of the replacements in favor of some of the strikers while denying reinstatement to the remainder of the strikers on the ground that the replacements were permanent." *Ante*, at 29.

In the end, therefore, the majority has placed an important gloss on the decision of the Board majority. That gloss is exactly what the Union requested, as a matter of law. Before a replacement worker who was hired as an employee at will can be characterized as "permanent," and thus before an employer may refuse to release the

worker when the economic strikers make an unconditional offer to return to work, the company must somehow make it clear that the employer's normal discretion to fire the at-will replacement employee is constrained: it may not fire the at-will worker just to create a position for a returning striker, unless that action is required either by a strike settlement agreement or by an order of the Board.

All that remains is the question how to apply these rules. The majority rightly notes that the court must defer to the Board's factual determinations. One of those determinations is the question whether, under the totality of the circumstances, the Jones Plastic replacement workers were permanent or temporary. The Board majority's opinion does not spell out the limitations on the employer's discretion with respect to at-will employees as well as the majority's opinion does. But, on these facts and bearing in mind the applicable standard of review, it is possible to find that the Company satisfied its burden of proof. I therefore concur in the judgment.