NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0460n.06

Nos. 15-1616/15-1678

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 11, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| TRI-STATE WHOLESALE BUILDING SUPPLIES, INC., | ) | |
| | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | ON PETITION FOR REVIEW AND |
| v. | ) | CROSS-PETITION FOR |
| | ) | ENFORCEMENT OF AN ORDER OF |
| NATIONAL LABOR RELATIONS BOARD, | ) | THE NATIONAL LABOR RELATIONS |
| | ) | BOARD |
| | ) | |
| Respondent. | ) | |

BEFORE:     DAUGHTREY, MOORE, and SUTTON, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. The president of Tri-State Wholesale Building Supplies mistakenly told the company's production manager that Tri-State's manufacturing employees would receive holiday pay for New Year's Day. When the employees learned that, in fact, they would not be paid for New Year's, they walked out and refused to return to work the next morning. Tri-State then hired replacement workers and sent the striking employees a written notice terminating their employment. The General Counsel of the National Labor Relations Board filed a complaint against Tri-State, alleging that the company engaged in an unfair labor practice in violation of the National Labor Relations Act when it discharged the strikers. An administrative law judge found that Tri-State violated the Act, and the Board affirmed his ruling. Tri-State petitioned this court for review, and the Board cross-petitioned for

enforcement of its order. For the reasons explained below, we order enforcement of the Board's order.

## FACTUAL AND PROCEDURAL BACKGROUND

Tri-State manufactures building parts such as doors and windows. At the time this dispute arose, the company had 20 manufacturing employees, who generally worked Monday through Thursday of each week and sometimes part or all of Friday, if requested to do so. None of Tri-State's employees belonged to a union.

Tri-State's policy, as set out in its employee handbook, was to shut down between Christmas Day and New Year's Day and to provide employees with up to one week's pay for that time period, regardless of the number of days the company was closed. The handbook provided that all full-time employees would receive holiday pay for Christmas Day and the "[w]eek between Christmas/New Year's." New Year's Day was not listed in the handbook as a paid holiday.

Prior to the 2013 holiday shutdown, production manager Tim Utz spoke with company president Kathy Caldon regarding the holiday work schedule and payroll issues. Utz asked Caldon when the employees would be paid for New Year's Day, and she told him that it would be in the first paycheck of 2014. Caldon asked Utz to ask the manufacturing employees to work on Friday, January 3, because the company would be behind on production as a result of the holiday shut down. Utz understood Caldon to say that the employees would be paid for New Year's Day if they worked January 3, and he relayed that information to the employees.

Tri-State's manufacturing department was shut down from Monday, December 23, 2013, through Wednesday, January 1, 2014. The manufacturing employees returned to work on

Thursday, January 2, worked on Friday, January 3, and resumed their normal work schedule the following week. On Wednesday afternoon, January 8, Caldon finally realized that the company normally did not pay employees for New Year's Day. She told Utz that she had "made a mistake" (according to Caldon) or "changed [her] mind" (according to Utz) and that the employees would not receive pay for January 1. When Utz relayed this information to the manufacturing employees, they were upset, and 11 manufacturing employees walked out after their afternoon break, along with Utz himself.

That evening, Tri-State's operations manager Danny Mickle communicated with both Utz and Caldon in an attempt to set up a meeting between Caldon and the disgruntled employees for the following day. Because Caldon already had scheduled another meeting for the morning of January 9, she offered to "meet with whoever works that day at 2:30." One of the employees who had walked out returned to work on January 9. Another employee showed up at the facility but refused to work until he met with Caldon, so Mickle asked him to leave. Utz and the other employees who had walked out called in sick and did not report for work because they, too, wanted to meet with Caldon before returning to work. Friday, January 10, was not a regularly scheduled production day, but Caldon asked the non-striking employees to work that day. None of the striking workers were asked to work on January 10, and none reported for work that day.

On January 10 Caldon made the decision to hire replacement workers, and to that end Tri-State held a job fair on Saturday, January 11. Caldon, Mickle, and Tri-State's human resources consultant interviewed applicants and extended offers to most of those interviewed. The offers were contingent on the applicant passing a drug test and a background check. Caldon and Mickle testified that the positions offered were full-time and were eligible for full benefits

after a set period of time. The employment application forms indicated that employment at Tri-State was at-will but did not clarify whether the positions were full-time, part-time, temporary, or permanent. Some applicants nevertheless filled out a new-hire form and checked "full-time" under "employee type."

It is impossible to discern from the evidence in the record which of the applicants receiving contingent offers of employment Tri-State actually hired. It appears that all but three of the contingent offers were withdrawn due to the applicants either testing positive for marijuana, having a criminal record or, in one case, being legally blind. Additionally, Caldon sent an e-mail to human resources indicating that her son Ryan had been hired, but Ryan's personnel file is absent from the record.

On the evening of Saturday, January 11, after completing the replacement interviews, Caldon called the striking employees and read a prepared statement to each of the ones she reached. The same statement was mailed to the striking employees in a letter dated January 12. It read:

> This letter is to inform you that Tri-State Wholesale has replaced you in your position in order to continue its operations. Please be advised that you should not report for work at Tri-State Wholesale for any future shifts as your position has been filled and your employment terminated. In the event an opening becomes available as a result of any replacement employees subsequently leaving the company, we will determine at that time whether you are eligible for a rehire with the company and you may be offered that position. You will be receiving the company's standard separation information. Thank you for your service with Tri-State Wholesale and we wish you success in your future endeavors.

Caldon was unable to convey this information to one of the striking employees because she did not have his current phone number or address, but on Monday, January 13, he arrived for work at Tri-State just as Caldon was arriving. Caldon informed him then that

he was "fired" (according to the employee) or "replaced" (according to Caldon) and obtained his current address to mail him the same letter.

One of the striking employees filed an unfair-labor-practice charge against Tri-State. The NLRB then filed a complaint on behalf of all the discharged employees, except for Utz, who, as a supervisor, was not protected by the NLRA.

## **DISCUSSION**

When presented with a petition to review a decision of the NLRB, we ask whether the Board's factual findings and its application of the law to the facts are supported by substantial evidence in the record. 29 U.S.C. § 160(e); *Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. (UAW), AFL-CIO v. NLRB*, 514 F.3d 574, 580 (6th Cir. 2008). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotation marks and citation omitted). We review the Board's legal conclusions *de novo*. *UAW*, 514 F.3d at 580.

The NLRA empowers the Board to prevent an employer from engaging in unfair labor practices. 29 U.S.C. § 160(a). It is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of," their right "to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. §§ 157, 158(a)(1). The Board affirmed the administrative law judge's determination that Tri-State's manufacturing employees were engaged in an activity protected under the Act when they walked out and refused to return to work, and Tri-State does not challenge this determination.

-5-

Instead, Tri-State appeals the Board's ruling that the company unlawfully discharged the employees who engaged in this protected activity. Tri-State argues that it permanently replaced, rather than discharged, the employees. "The test of whether an employee was discharged depends upon the reasonable inferences that the employees could draw from the language used by the employer." *NLRB v. Downslope Indus., Inc.*, 676 F.2d 1114, 1118 (6th Cir. 1982). The NLRB applied the correct legal standard in analyzing this issue, and substantial evidence supports its determination that the striking employees were discharged.

Tri-State's letter to the strikers began by stating that Tri-State "has replaced you in your position" and went on to say that "your position has been filled and your employment terminated. . . . You will be receiving the company's standard separation information. . . . we wish you success in your future endeavors." From this language the strikers reasonably could infer that they had been discharged. *See Downslope*, 676 F.2d at 1118. Indeed, some of the strikers testified before the administrative law judge that Caldon told them they were terminated or fired, supporting their interpretation of the letter. As the administrative law judge put it, the letter "most definitely would lead these strikers to conclude that they had been fired."

Tri-State argues that "the reinstatement rights of economic strikers are contingent on several factors that the [administrative law judge] and the Board ignored." This argument misses the mark, however, because factors affecting the strikers' reinstatement rights have no relevance to the question of whether the strikers reasonably inferred from the language in the letter that they had been discharged. Tri-State also argues that the Board "erred in relying on the Company's use of the word 'terminated'" and that "[c]ourts frequently conflate the permanent replacement of economic strikers with their discharge or termination," citing two Eighth Circuit

cases that are not binding on this court. Moreover, the Board cited several other non-binding cases—on which we could rely just as easily—that reach the opposite conclusion. In addition, the use of the word "terminated" is not the only portion of the letter from which the strikers reasonably could have inferred they were discharged. The letter also informed the employees they would receive "standard separation information," thanked them for their service, and wished them success in future endeavors.

In its reply brief, Tri-State relies on the Act's free-speech provision, 29 U.S.C. § 158(c), to argue that the letter could not have discharged the striking employees. However, we decline to consider this argument because Tri-State failed to raise it in its exceptions to the administrative law judge's opinion or in its opening brief on appeal. We generally will not consider objections that were not "urged before the Board" unless the failure to do so is "excused because of extraordinary circumstances." 29 U.S.C. § 160(e); *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66 (1982). Contrary to Tri-State's assertion, its general exception to the administrative law judge's findings, in which it did not cite § 158(c) or reference "free speech," failed to "apprise the Board of an intention to bring up the question" and, thus, lacked "the specificity required . . . to escape the bar imposed by" 29 U.S.C. § 160(e). *NLRB v. U.S. Postal Serv.*, 833 F.2d 1195, 1202–03 (6th Cir. 1987) (internal quotation marks and citations omitted). Furthermore, "[t]his court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived, or at least forfeited." *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013). Tri-State did not cite § 158(c) or mention "free speech" in its opening brief, thereby forfeiting this argument.

In sum, the Board's determination that Tri-State unlawfully discharged the striking employees is legally correct and is supported by substantial evidence in the record, and Tri-State's arguments to the contrary are unavailing.

Tri-State also challenges on appeal the Board's order requiring Tri-State to reinstate the strikers. The company argues that reinstatement is not required because it hired permanent, rather than temporary, replacements. The status of the replacements has no bearing on our previous analysis of whether the discharge was unlawful, but it does affect the available remedy. The Seventh Circuit helpfully explained the legal framework:

> As a general rule, employees engaged in an economic strike are entitled to reinstatement after the conclusion of the strike. *NLRB v. Transp. Co. of Tex.*, 438 F.2d 258, 263 (5th Cir. 1971). If an employer can show a "legitimate and substantial business justification," however, it may refuse to reinstate economic strikers. *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 379 (1967). One such justification for refusing to reinstate is that an employer may hire permanent replacements to perform the strikers' tasks. *NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333 (1938); *NLRB v. Wells Fargo Armored Serv. Corp.*, 597 F.2d 7 (1st Cir. 1979). The rationale for this exception to the general rule is that the employer's interest in continuing his business during a strike and the needed inducement of permanent employment to obtain replacements is a sufficient business justification overcoming protection for economic strikers. The replacements must be permanent at the time of the discharge, however, or the discharge and refusal to reinstate constitute an unfair labor practice. *NLRB v. Int'l Van Lines*, 409 U.S. 48, 50 (1972); *NLRB v. W. C. McQuaide, Inc.*, 552 F.2d 519, 532–32 (3d Cir. 1977). If an employer hires replacements without a commitment or understanding that the job is permanent and also discharges the strikers, the interest in protecting economic strikers by an entitlement to reinstatement is not overcome by a substantial business justification. The employer has not had to offer the jobs on a permanent basis as an inducement to continuing his operations. Hence, an economic striker whose job has not been permanently promised to a replacement at the time the striking employee is discharged is entitled to reinstatement. A determination of whether the job has been permanently promised is a question of fact which we will only review to see if it is supported by substantial evidence. *Universal Camera Corp.*, 304 U.S. at 477.

*NLRB v. Mars Sales & Equip. Co.*, 626 F.2d 567, 572–73 (7th Cir. 1980) (footnote omitted, internal citation format altered).[1]

Tri-State bears the burden of proving that the replacements were permanent and, thus, that it has a legitimate and substantial business justification for failing to reinstate the strikers. *See Fleetwood Trailer Co.*, 389 U.S. at 378; *United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. Serv. Workers Int'l Union, AFL-CIO v. NLRB*, 544 F.3d 841, 850 (7th Cir. 2008). The employer's intent to hire permanent workers, alone, will not suffice to meet its burden. *United Steel*, 544 F.3d at 851. Rather, the employer must show that the employer and the replacements mutually understood that the replacements received jobs on a permanent basis and would not be terminated if the strikers returned to work. *Id.* at 850–51.

No doubt Tri-State intended to hire permanent replacements, as evidenced by its managers' testimony. However, Tri-State does not dispute that it failed to tell the replacements whether they were permanent or temporary or even to inform them about the strike, a burden of proof that falls on Tri-State. *See O.E. Butterfield, Inc.*, 319 NLRB 1004, 1006 (1995) ("It is . . . incumbent on the employer, which has control over employees' status, to communicate clearly with employees as to whether they have been hired on a permanent or temporary basis."). But, Tri-State introduced no evidence from the replacement workers to show that the workers understood their employment to be permanent. The only evidence in the record suggesting that

---

[1] Contrary to Tri-State's assertions, a striker who is the victim of an unfair labor practice is entitled to unconditional reinstatement and need not affirmatively request it. *See Int'l Van Lines*, 409 U.S. at 53 ("Unconditional reinstatement of the discharged employees was proper for the simple reason that they were the victims of a plain unfair labor practice. . . . [T]he discharges themselves were a sufficient ground for the Board's reinstatement order."); *Garrett R.R. Car & Equip., Inc. v. NLRB*, 683 F.2d 731, 740–41 (3d Cir. 1982) (explaining the rationale behind the Board's newly announced rule of not requiring an unlawfully discharged striker to unconditionally request reinstatement to trigger the employer's obligation to provide back-pay); *Naperville Ready Mix, Inc.*, 329 NLRB 174, 185 (1999) ("When strikers are unlawfully discharged, they are not required to request reinstatement."). Furthermore, Tri-State never urged an exception before the Board to the administrative law judge's articulation of this legal standard and cannot contest it now.

the replacements understood their employment to be permanent is that they checked "full-time" rather than "part-time" or "temporary" on their employment paperwork. But, "[u]nder Board law, 'full-time' is not the equivalent of 'permanent.'" *O.E. Butterfield, Inc.*, 319 NLRB at 1006.

Tri-State relies on the assumption that, in the absence of a picket line, the replacements likely did not know about the strike and thus had no reason to question the permanence of their employment. On review, the Board rejected this argument when it found that several of the replacements knew people who worked at Tri-State and thus had reason to know of the strike. Although Tri-State finds fault with the Board's statement that "at least 4" replacement workers knew about the strike due to their relationships with company employees, Tri-State itself acknowledges that at least three of the replacements knew Tri-State employees. The difference between "at least 4" and "definitely three" is minor, and the Board's possible minor mistake does not warrant a finding that there was inadequate evidence in the record to support its conclusion. *See Universal Camera Corp.*, 340 U.S. at 477.

Tri-State further argues that there was no reason for the replacements to think they were not permanent employees because it hired them in a careful manner, using the same procedures with which it hires all of its employees. Leaving aside the fact that the replacements had no way of knowing how Tri-State typically hires its employees, Tri-State's argument fails because, as the party with the burden of proof, Tri-State cannot receive the benefit of any doubt as to what the replacements knew or how they perceived their employment. The company easily could have called the replacements to testify that they viewed their employment at Tri-State as permanent, but it chose not to do so. In light of the foregoing, we hold that substantial evidence

supports the Board's decision that Tri-State failed to prove it hired permanent replacements before discharging the strikers.

## CONCLUSION

For the reasons explained above, the NLRB's decisions that Tri-State unlawfully discharged the striking employees and that Tri-State failed to prove it hired permanent replacements are supported by substantial evidence in the record. As a result, the Board correctly ordered Tri-State to offer reinstatement to the discharged employees, discharge any replacements if necessary, and compensate the unlawfully discharged employees for any loss of earnings and benefits. Tri-State's petition for review is DENIED, and the Board's petition for enforcement is GRANTED.